

**Jason B. Harris**
**Clerk of Court**

# Livingston Parish, LA

**Civil Case Ledger Report**
**For Case Number : 000000178860**

| | |
|---|---|
| **Case Number :** 000000178860 | |
| **Division :** C | |
| **Judge Name :** ERIKA SLEDGE | |
| **Status :** OPEN | |
| **Date Filed :** 07/18/2023 | |
| **Proceeding Type :** DAMAGES | |
| **Remarks :** | |

**Plaintiff :** Livingston Parish School Board
**Attorney Name :** HONEYCUTT, D BLAYNE
**Attorney Firm :** FAYARD & HONEYCUTT
**Attorney Address :** 519 FLORIDA AVE SW
DENHAM SPRINGS, LA 70726-0000

**Defendant :** Meta Platforms Inc
**Attorney Firm :** IN PROPER PERSON
**Attorney Address :** UNASSIGNED
LIVINGSTON, LA 00000-0000

| Date | Description | Party | Clerk Amount | Other Payee | Other Amount | Refunds | Paid Date / Check Number | Deposits | Balance | Regular Costs | Pauper Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/18/2023 | CONFORMED COPY | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $3.00 | | | | Payable - Not Paid | | ($3.00) | $0.00 | $3.00 |
| 07/18/2023 | INDEXING OF NAMES 9 | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $18.00 | | | | Payable - Not Paid | | ($21.00) | $0.00 | $21.00 |
| 07/18/2023 | PETITION - NEW SUIT | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $282.00 | | | | Payable - Not Paid | | ($303.00) | $0.00 | $303.00 |
| 07/18/2023 | JUDICIAL EXPENSE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | 21ST JUDICIAL EXPENSE FUND | $20.00 | | Payable - Not Paid | | ($323.00) | $0.00 | $323.00 |
| 07/18/2023 | JUDICIAL ADMINISTRATOR | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | LOUISIANA STATE TREASURER | $29.50 | | Payable - Not Paid | | ($352.50) | $0.00 | $352.50 |
| 07/18/2023 | INITIALIZATION FEE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $20.00 | | | | Payable - Not Paid | | ($372.50) | $0.00 | $372.50 |
| 07/18/2023 | INDIGENT TRANSCRIPT FUND | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | 21ST JUDICIAL EXPENSE FUND ITF | $0.50 | | Payable - Not Paid | | ($373.00) | $0.00 | $373.00 |
| 07/18/2023 | JAMIS REPORT | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $1.50 | | | | Payable - Not Paid | | ($374.50) | $0.00 | $374.50 |
| 07/18/2023 | SERVICE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $20.00 | | | | Payable - Not Paid | | ($394.50) | $0.00 | $394.50 |
| 07/18/2023 | SOUTHEAST LEGAL SERVICES | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | SOUTHEAST LA LEGAL SERVICES | $2.86 | | Payable - Not Paid | | ($397.36) | $0.00 | $397.36 |
| 07/18/2023 | NEW SUIT-COURTHOUSE FUND | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $100.00 | | | | Payable - Not Paid | | ($497.36) | $0.00 | $497.36 |
| 07/18/2023 | JUDICIAL COLLEGE FEE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | LOUISIANA SUPREME COURT 2 | $0.50 | | Payable - Not Paid | | ($497.86) | $0.00 | $497.86 |
| 07/18/2023 | COVER LETTER | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($497.86) | $0.00 | $497.86 |
| 07/18/2023 | ADDITIONAL SERVICE 3 | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $60.00 | | | | Payable - Not Paid | | ($557.86) | $0.00 | $557.86 |
| 07/18/2023 | LONG ARM STATUTE 5 | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $100.00 | | | | Payable - Not Paid | | ($657.86) | $0.00 | $657.86 |
| 07/19/2023 | CITATION - FORM | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($657.86) | $0.00 | $657.86 |
| 07/19/2023 | CITATION - FORM | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($657.86) | $0.00 | $657.86 |
| 07/19/2023 | CITATION - FORM | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($657.86) | $0.00 | $657.86 |
| 07/19/2023 | CITATION - FORM | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($657.86) | $0.00 | $657.86 |
| 07/19/2023 | CITATION - FORM | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($657.86) | $0.00 | $657.86 |
| 07/19/2023 | CITATION - FORM | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($657.86) | $0.00 | $657.86 |

EXHIBIT A — tabbies



**Jason B. Harris**
**Clerk of Court**

# Livingston Parish, LA

**Civil Case Ledger Report**

**For Case Number : 000000178860**

## Case Number - 000000178860

| Date | Description | Party | Clerk Amount | Other Payee | Other Amount | Refunds | Paid Date / Check Number | Deposits | Balance | Regular Costs | Pauper Costs |
|------|-------------|-------|--------------|-------------|--------------|---------|--------------------------|----------|---------|---------------|--------------|
| 07/19/2023 | CITATION - FORM | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($657.86) | $0.00 | $657.86 |
| 07/19/2023 | CITATION - FORM | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($657.86) | $0.00 | $657.86 |
| 07/19/2023 | CITATION - FORM | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($657.86) | $0.00 | $657.86 |
| 08/09/2023 | COVER LETTER | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($657.86) | $0.00 | $657.86 |
| 08/09/2023 | AFFIDAVIT OF SERVICE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $6.00 | | | | Payable  -  Not Paid | | ($663.86) | $0.00 | $663.86 |
| 08/09/2023 | EXHIBIT A | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $2.00 | | | | Payable  -  Not Paid | | ($665.86) | $0.00 | $665.86 |
| 08/09/2023 | AFFIDAVIT OF SERVICE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $6.00 | | | | Payable  -  Not Paid | | ($671.86) | $0.00 | $671.86 |
| 08/09/2023 | EXHIBIT A | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $2.00 | | | | Payable  -  Not Paid | | ($673.86) | $0.00 | $673.86 |
| 08/09/2023 | AFFIDAVIT OF SERVICE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $6.00 | | | | Payable  -  Not Paid | | ($679.86) | $0.00 | $679.86 |
| 08/09/2023 | EXHIBIT A | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $2.00 | | | | Payable  -  Not Paid | | ($681.86) | $0.00 | $681.86 |
| 08/09/2023 | AFFIDAVIT OF SERVICE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $6.00 | | | | Payable  -  Not Paid | | ($687.86) | $0.00 | $687.86 |
| 08/09/2023 | EXHIBIT A | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $4.00 | | | | Payable  -  Not Paid | | ($691.86) | $0.00 | $691.86 |
| 08/09/2023 | PLEADINGS-COURTHOUSE FUND | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $50.00 | | | | Payable  -  Not Paid | | ($741.86) | $0.00 | $741.86 |
| 08/10/2023 | SHERIFFS RETURN P/CHARTER COMMUNICATIONS INC THRU AGENT OF SERV/7-26-23 | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | EAST BATON ROUGE PARISH SHERIFF | $33.12 | | Payable  -  Not Paid | | ($774.98) | $0.00 | $774.98 |
| 08/10/2023 | NOTICE OF RETURN TO ATTY | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $6.00 | | | | Payable  -  Not Paid | | ($780.98) | $0.00 | $780.98 |
| 08/10/2023 | SHERIFF RTN FILING FEE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $10.00 | | | | Payable  -  Not Paid | | ($790.98) | $0.00 | $790.98 |
| 08/10/2023 | PLEADINGS-COURTHOUSE FUND | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $10.00 | | | | Payable  -  Not Paid | | ($800.98) | $0.00 | $800.98 |
| 08/10/2023 | SHERIFFS RETURN P/CHARTER COMMUNICATIONS LLC THRU AGENT OF SERV/7-26-23 | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | EAST BATON ROUGE PARISH SHERIFF | $33.12 | | Payable  -  Not Paid | | ($834.10) | $0.00 | $834.10 |
| 08/10/2023 | NOTICE OF RETURN TO ATTY | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $6.00 | | | | Payable  -  Not Paid | | ($840.10) | $0.00 | $840.10 |
| 08/10/2023 | SHERIFF RTN FILING FEE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $10.00 | | | | Payable  -  Not Paid | | ($850.10) | $0.00 | $850.10 |
| 08/10/2023 | PLEADINGS-COURTHOUSE FUND | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $10.00 | | | | Payable  -  Not Paid | | ($860.10) | $0.00 | $860.10 |
| 08/10/2023 | SHERIFFS RETURN P/COX COMMUNICATIONS INC THRU AGENT OF SERV/7-26-23 | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | EAST BATON ROUGE PARISH SHERIFF | $33.12 | | Payable  -  Not Paid | | ($893.22) | $0.00 | $893.22 |
| 08/10/2023 | NOTICE OF RETURN TO ATTY | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $6.00 | | | | Payable  -  Not Paid | | ($899.22) | $0.00 | $899.22 |

Verdict Version
2.23.24

PO Box 1150 ** Livingston, LA 70754-1150 ** (225) 686-2216

Printed On :   08/22/2023
At :   2:53:58 PM
Page 2 of 4



**Jason B. Harris**
**Clerk of Court**

**Livingston Parish, LA**

**Civil Case Ledger Report**
**For Case Number : 000000178860**

## Case Number - 000000178860

| Date | Description | Party | Clerk Amount | Other Payee | Other Amount | Refunds | Paid Date / Check Number | Deposits | Balance | Regular Costs | Pauper Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/10/2023 | SHERIFF RTN FILING FEE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $10.00 | | | | Payable - Not Paid | | ($909.22) | $0.00 | $909.22 |
| 08/10/2023 | PLEADINGS-COURTHOUSE FUND | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $10.00 | | | | Payable - Not Paid | | ($919.22) | $0.00 | $919.22 |
| 08/17/2023 | SHERIFFS RETURN P/COX COMMUNICATIONS LA LLC/7-26-23 | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | EAST BATON ROUGE PARISH SHERIFF | $33.12 | | Payable - Not Paid | | ($952.34) | $0.00 | $952.34 |
| 08/17/2023 | NOTICE OF RETURN TO ATTY | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $6.00 | | | | Payable - Not Paid | | ($958.34) | $0.00 | $958.34 |
| 08/17/2023 | SHERIFF RTN FILING FEE | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $10.00 | | | | Payable - Not Paid | | ($968.34) | $0.00 | $968.34 |
| 08/17/2023 | PLEADINGS-COURTHOUSE FUND | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $10.00 | | | | Payable - Not Paid | | ($978.34) | $0.00 | $978.34 |
| 08/21/2023 | COVER LETTER | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | | | | | | | ($978.34) | $0.00 | $978.34 |
| 08/21/2023 | CONFORMED COPY | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $3.00 | | | | Payable - Not Paid | | ($981.34) | $0.00 | $981.34 |
| 08/21/2023 | MOTION TO ENROLL ADDITIONAL COUNSEL | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $6.00 | | | | Payable - Not Paid | | ($987.34) | $0.00 | $987.34 |
| 08/21/2023 | ORDER | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $6.00 | | | | Payable - Not Paid | | ($993.34) | $0.00 | $993.34 |
| 08/21/2023 | PLEADINGS-COURTHOUSE FUND | Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $10.00 | | | | Payable - Not Paid | | ($1,003.34) | $0.00 | $1,003.34 |
| | | **Totals :** | **$817.50** | | **$185.84** | **$0.00** | | **$0.00** | **($1,003.34)** | **$0.00** | **$1,003.34** |

### Breakdown By Party

| Party Name | Total Deposit | Total Prepaid | Total Cost | Total Refunds | Balance |
|---|---|---|---|---|---|
| Plaintiff - Pauper - LIVINGSTON PARISH SCHOOL BOARD | $0.00 | $0.00 | $1,003.34 | $0.00 | ($1,003.34) |
| Defendant - BYTEDANCE INC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Defendant - CHARTER COMMUNICATIONS INC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Defendant - CHARTER COMMUNICATIONS LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Defendant - COX COMMUNICATIONS INC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Defendant - COX COMMUNICATIONS LOUISIANA LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Defendant - INSTAGRAM LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Defendant - META PLATFORMS INC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Defendant - TIKTOK INC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | **$0.00** | **$0.00** | **$1,003.34** | **$0.00** | **($1,003.34)** |

Verdict Version
2.23.24

PO Box 1150 ** Livingston, LA 70754-1150 ** (225) 686-2216

Printed On: 08/22/2023
At : 2:53:58 PM
Page 3 of 4

**Jason B. Harris**
**Clerk of Court**

**Livingston Parish, LA**

**Civil Case Ledger Report**
**For Case Number : 000000178860**

***** Current Escrow Balance(s) *****

| Escrow Date | Party | Amount |
|---|---|---|
| | | $0.00 |
| | Escrow Totals : | $0.00 |

Verdict Version
2.23.24

PO Box 1150 ** Livingston, LA 70754-1150 ** (225) 686-2216

Printed On : 08/22/2023
At : 2:53:58 PM
Page 4 of 4

**CIVIL**

# FAYARD AND HONEYCUTT

### Attorneys at Law
### A Professional Corporation

Calvin C. Fayard, Jr.
D. Blayne Honeycutt
Hannah Honeycutt Calandro

519 Florida Avenue, SW
Denham Springs, Louisiana 70726
Telephone: (225) 664-0304
Fax: (225) 664-2010

dbhoneycutt@fayardlaw.com
hannah@fayardlaw.com

+ A PROFESSIONAL CORPORATION

Of Counsel

Haydn S. Berey
Wanda J. Edwards

July 18, 2023

**Via Hand Delivery**
Clerk of Court
21st Judicial District Court
PO Box 1150
Livingston, LA 70754

RE:    **Livingston Parish School Board vs Meta Platforms, Inc., et al**
       **New Civil Suit**

Dear Sir/Madam:

Enclosed please find a Petition for Damages to be filed into the suit record. After filing same, I ask that you please provide me with a file stamped copy.

Please be advised that I represent the Livingston Parish School Board; therefore, there are no advance costs required to file these pleadings.

If you have any questions, please feel free to give me a call.

Sincerely,

**FAYARD & HONEYCUTT**

By:
D. Blayne Honeycutt

DBH/bz
Enclosure



LIVINGSTON PARISH SCHOOL BOARD

VERSUS

META PLATFORMS, INC., INSTAGRAM,
LLC, BYTEDANCE, INC., TIKTOK, INC.,
CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS, LLC.,
COX COMMUNICATIONS, INC., AND
COX COMMUNICATIONS LOUISIANA,
LLC

21ST JUDICIAL DISTRICT COURT

DOCKET NO: 178860    DIVISION: C

PARISH OF LIVINGSTON

STATE OF LOUISIANA

FILED 2023 JUL 18 PM 4:27 DEPUTY CLERK CLERK OF COURT PARISH OF LIVINGSTON

---

### PETITION FOR DAMAGES AND INJUNCTIVE RELIEF

**NOW INTO COURT**, through undersigned counsel, comes the plaintiff, **LIVINGSTON PARISH SCHOOL BOARD**, a political subdivision within the Parish of Livingston which respectfully represents that:

### I.   INTRODUCTION

1.    *"It's seducing you, it's manipulating you, it wants things from you... Social media isn't a tool waiting to be used. It has its own goals, and it has its own means of pursuing them by using your psychology against you."*[1]

2.    This is the warning of Tristan Harris, a disillusioned former Silicon Valley executive being interviewed in the documentary *The Social Dilemma*, which addresses our addiction to posts, likes, pokes, chats, and all of the other prompts that Big Tech has deployed to keep us slaves to their apps.

3.    Another interviewee puts it even more bluntly: *"There are only two industries that call their customers 'users': illegal drugs and software."*[2]

4.    This addiction is by design.  Highly-skilled and highly-paid employees of the biggest social media platforms have invested years of research and analysis into designing their apps with features that make it impossible not just to quit using the app, but simply to put our phones down to attend to the most basic functions of our daily lives.  The apps demand our attention first thing in the morning and last thing at night, at the dinner table, while we're walking down the street, even when we're driving.

---

[1] *The Social Dilemma.* Directed by Jeff Orlowski-Yang; Produced by Exposure Labs, Argent Pictures, The Space Program; 2020. *Netflix,* https://www.netflix.com/watch/81254224.
[2] *Id.*

5.      Defendants rely on three design elements to make their respective social media platforms addictive to all users, and to children in particular: (1) low-friction variable rewards; (2) navigation manipulation; and (3) social manipulation.  Each of these design elements, discussed in detail below,[3] is rooted in psychology and meant to exploit human behavior in a manner that makes Instagram and TikTok as habit-forming as an opioid.

6.      Children are the most vulnerable to these intentionally addictive design elements. As one specialist in social media addiction notes, "[a]dolescence is second only to infancy when it comes to growth. Therefore, the impact of social media on a developing teen's mind and body can be huge."[4]  Social media platforms like Instagram and TikTok, with design elements that intentionally keep children engaged for as long as possible—to the exclusion of all other activities—harm their users emotionally, developmentally, and physically. They lead to a condition known as "problematic internet use,"[5] which is associated with a range of harms, including but not limited to exposure to predators and online bullies, age-inappropriate content, damage to children's self-esteem, and increased risk of eating disorders and even suicide.

7.      Ironically, no one understands this better than Defendants.  For example, internal documents show that Defendants Meta and Instagram conducted internal studies and analyses that pointed to only one conclusion: Instagram was harmful to its child users.  Rather than coming clean, Defendants kept this information hidden from the public, and doubled down on making the Instagram platform as addictive as possible.

8.      Worse, still, Meta and Instagram *are aware* that their child user base *wants the platform to be less addictive.*

---

[3] *See* Section IV.B, *infra.*
[4] https://www.newportacademy.com/resources/mental-health/teens-social-media-addiction/
[5] *See,* Wen Li, et al., *Diagnostic Criteria for Problematic Internet Use among U.S. University Students: A Mixed-Methods Evaluation,* PLOS ONE (Jan. 11, 2016).



Fig. 1 – *Slide from Defendant Instagram's internal study titled
"Teen Mental Health Deep Dive"*

9.     They also know that, due to Instagram's technological sophistication and the way in which it already controls children's brains, parents and other caregivers are powerless to intervene.

Fig. 2 – *Slide from Instagram's "Teen Mental Health Deep Dive"*

10.    Similarly, internal documents show that TikTok's sole purpose—rendered with brutal efficiency in its state-of-the-art, machine-learning-fueled algorithms—is to keep its users constantly on the app. In the words of one of its founders, "[e]ven if you have tens of millions of users...you have to keep them always engaged."

11.    This action is brought to protect children and families in the State of Louisiana from Defendants' intentional manipulation of children via sophisticated design elements deployed on

3

Instagram and TikTok. Defendants do this to keep Louisiana children addicted to their social media platforms, endlessly scrolling through photographs and videos, so that Defendants may surreptitiously collect their private online data and make billions by selling that data to advertisers who then subject Louisiana's children to sophisticated targeted advertising, also on Defendants' platforms. The longer children stay on Instagram and TikTok, the more opportunities exist for them to be monetized.

12. Defendants do this with full knowledge that their products cause profound mental and physical harm to children, and that their addictive design elements only amplify those harms, particularly on young, developing brains. Indeed, Meta and Instagram's own researchers privately acknowledged that "[w]e make body image issues worse for one in three teen girls."[6] The harms range from anxiety to depression to poor sleep to eating disorders and even to self-harm and suicide.

13. The Internet holds tremendous potential to benefit children and their families. Louisiana children, particularly in rural areas, routinely use apps, websites, and other online services to attend and participate in school, communicate with friends and loved ones, learn about and engage with the political process, and be entertained. And children should be able to engage in these valuable online activities without being harmed by the very providers of the services they use. But they and their families cannot be assured of the safety—or even the neutrality—of the online services they use. The goals of Defendants are at odds with children's best interests. Defendants have an interest in getting and keeping users on their social media platforms as much as possible to generate profits. This interest inherently conflicts with users' interest in an online experience that contributes to, rather than detracts from, their overall wellbeing.

14. Additionally, separate Internet Service Provider ("ISP") Defendants Charter Communications (d/b/a Spectrum) ("Charter" or "Spectrum") and Cox Communications ("Cox") (collectively, "ISP Defendants") are responsible for facilitating minors' access—either via computer or Internet-enabled mobile device such as smartphone or tablet—to social media platforms such as Instagram and TikTok. Plaintiff separately seeks prospective injunctive relief

---

[6] Georgia Wells, Jeff Horwitz, and Deepa Seetharaman, *Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show*, Wall Street Journal (Sept. 14, 2021) (available at https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739?mod=article_inline).

prohibiting the ISP Defendants from allowing students in Plaintiff's schools access to or from Defendants' social media platforms during school hours.

15.    With this Action, Plaintiff seeks to protect Louisiana's most vulnerable citizens from unfair harms and restore Louisiana children's and families' trust. Parents, not Silicon Valley executives, need to decide what is best for their children, and to have complete autonomy as they do so. Tech companies must be held accountable for their role in spreading online addiction among Louisiana's children in violation of Louisiana's laws and public policy.

## II.    PARTIES

16.    Plaintiff Livingston Parish School Board, an arm of the State of Louisiana, is a quasi-governmental body organized under the law of the State of Louisiana. Plaintiff is domiciled in Livingston Parish, Louisiana. Plaintiff is charged with the responsibility to operate the Livingston Parish public school system, grades K through 12. Substantial funding (over 75% of its budget) and its curriculum and teachers are subject to supervision of the Louisiana Department of Education.

### Instagram Defendants

17.    Defendant Meta Platforms, Inc. (from 2005 to 2021 formerly known as Facebook Inc.) is a multinational technology company that designs, distributes, and promotes multiple social media platforms, including Instagram. Meta Platforms, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.

18.    Instagram LLC is a subsidiary of Meta that is wholly owned and controlled by its parent. Meta Platforms, Inc. is the sole member of Instagram, LLC, whose principal place of business is in Menlo Park, California. To the extent the allegations in this petition against Meta relate to the Instagram product specifically, Plaintiff realleges them in full against Instagram LLC as well.

### TikTok Defendants

19.    Defendant ByteDance Inc. ("ByteDance Inc." or "ByteDance") is a Delaware corporation with its principal place of business in Mountain View, California. ByteDance designs, distributes, and promotes multiple social media platforms, and is the owner of TikTok. Defendant ByteDance, Inc. is a wholly-owned subsidiary of ByteDance, Ltd., a Cayman Islands corporation.

20.    Defendant TikTok Inc. ("TikTok Inc." or "TikTok") operates the social media application and platform known as "TikTok." TikTok was incorporated in California on April 30,

2015, with its principal place of business in Culver City, California. To the extent the allegations in this petition against ByteDance relate to the TikTok product specifically, Plaintiff realleges them in full against TikTok as well.

### ISP Defendants

21. ISP Defendant Charter Communications, Inc. d/b/a Spectrum is a provider of Internet and Cable services throughout the United States, including in Livingston Parish. Charter Communications, Inc. is incorporated in Delaware with its principal place of business in Stamford, Connecticut. Its operations in Louisiana—including those that are the subject of this Petition—are facilitated through its wholly-owned Louisiana subsidiary, Charter Communications, LLC, domiciled in Louisiana and operated under charter number 36976104T (collectively, Charter Communications, Inc. and Charter Communications, LLC are referred to herein as "Charter" or "Spectrum").

22. ISP Defendant Cox Communications, Inc. is a provider of Internet and Cable services throughout the United States, including in Livingston Parish. Cox Communications, Inc. is incorporated in Delaware with its principal place of business in Atlanta, Georgia. Its operations in Louisiana—including those that are the subject of this Petition—are facilitated through its wholly-owned Louisiana subsidiary, Cox Communications Louisiana, LLC, domiciled in Louisiana and operating under charter number 36892085T (collectively, Cox Communications, Inc. and Cox Communications Louisiana, LLC are referred to herein as "Cox").

### III. JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this action pursuant to LA. Code Civ. Proc. Art. 2.

24. This Court has personal jurisdiction pursuant to LA. Code Civ. Proc. Art. 6.

25. Venue is proper in this district pursuant to LA Code Civ. Proc. Art. 74 because Plaintiff sustained damages in this parish. *See* LA. Code Civ. Proc. Art. 74 ("An action for the recovery of damages for an offense or quasi offense may be brought in the parish where the wrongful conduct occurred, or in the parish where the damages were sustained. An action to enjoin the commission of an offense or quasi offense may be brought in the parish where the wrongful conduct occurred or may occur.").

### IV. FACTUAL ALLEGATIONS

#### A. DEFENDANTS' SOCIAL MEDIA PLATFORMS, GENERALLY

### i. Instagram

26.     Instagram is a photo- and video-sharing social networking service. Users engage with it either via its website or its free-standing app, which users download to their smartphone or other mobile device. Instagram allows users to upload ("post") photos or videos that can be edited with filters and organized by hashtags and geographical tagging. Users can browse other users' posts by tag or location, view trending content, like photos, and follow other users to add their content to a personal feed.



Fig. 3[7]

27.     Instagram has more than one billion monthly active users worldwide, and roughly 160 million users in the United States.[8] In 2021, 57% of surveyed American children ages 12–17 said they used Instagram every week,[9] while this year, 62% of teens ages 13-17 reported using Instagram, with 10% of teens reporting almost constant use.[10]

---

[7] Jon Fingas, *Instagram is making its TikTok-like 'Reels' easier to find*, Engadget (June 24, 2020) (available at https://www.engadget.com/instagram-reels-expansion-000141339.html).

[8] https://www.statista.com/statistics/578364/countries-with-most-instagram-users/

[9] Salvador Rodriguez, *TikTok usage surpassed Instagram this year among kids aged 12 to 17, Forrester survey says*, CNBC (Nov. 18, 2021, 5:51 PM EST), (available at https://www.cnbc.com/2021/11/18/tiktokusage-topped-instagram-in-2021-among-kids-12-to-17-forrester-.html ).

[10] Emily A. Vogels et al., *Teens, Social Media and Technology 2022*, Pew Research Center (Aug. 10, 2022) (available at https://www.pewresearch.org/internet/2022/08/10/teens-social-media-andtechnology-2022).

28.     Instagram is a critical social media platform for young people.  It has been described by the Wall Street Journal as "the online equivalent of the high-school cafeteria: a place for teens to post their best photos, find friends, size each other up, brag and bully."[11]

29.     A slide from a 2017 internal presentation at Meta states "Instagram is for teens," describes the perceived user base as primarily middle schoolers and high-schoolers and includes quotes from 11- and 12-year-olds saying that people their age use Instagram.



Fig. 4 - *A 2017 internal presentation at Meta indicates*
*that the company thinks of Instagram as a product for tweens and teens*

30.     Like all social media platforms, Instagram does not charge its users for access. Instead, it monitors its users and surreptitiously collects data related to their online lives— including the way in which they use the service, the posts with which they interact, the friends they have, the places they go, the advertisements they view, and even what users do on other sites or apps.  Meta, Instagram's parent company, is consistently the target of regulatory actions, lawsuits, and news reports related to the vast troves of personal data it acquires on individuals, which it uses to create detailed, individual profiles that in turn are employed to serve users targeted advertising.

31.     The practical effect of this arrangement—free access to the Instagram platform in exchange for personal data—is best expressed in the documentary "The Social Dilemma," which

---

[11] Georgia Wells, Jeff Horwitz, and Deepa Seetherman, *Facebook Knows Instagram is Toxic for Teen Girls, Company Documents Show*, Wall Street Journal (Sep. 14, 2021) (available at https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739).

quotes Google's former design ethicist, Tristan Harris: "*if you're not paying for the product, then you are the product.*"[12]

32.    Because Instagram views its users as its product, and because it can only monetize its users while they are on the Instagram platform, Instagram is incentivized to keep its users on the platform as long as possible, and as often as possible.  Via his current project, The Center for Humane Technology, Tristan Harris further explains this concept:

> Our attention is a limited resource. There are only so many waking hours in the day, and therefore only so many things we can focus on. When we pay attention to one thing, we're not paying attention to something else.
>
> This fact of life has been deeply complicated by technology. With more information and more choices at our fingertips than ever before, there are unprecedented demands on our attention.
>
> This feeling of constant distraction is fueled by tech companies that rely on capturing your attention to make money, normally by selling it to advertisers.
>
> ...
>
> Each app is caught in a race for your attention, competing not just against other apps, but also against your friends, your family, your hobbies, and even your sleep.
>
> ...
>
> *[S]ocial media companies don't sell software, they sell influence. They collect in-depth data about how to influence your decisions, then sell that influence to the highest bidder. The more time they can get you to spend scrolling and clicking, the more data they can collect and the more ads they can sell.*[13]

33.    Competition for users' attention is fierce, and social media platforms—like Defendant's—are purposely designed to addict their users.  Defendant has both in-house and external research initiatives designed to document and improve engagement reporting and have projects that use neuromarketing and virtual reality techniques to measure effectiveness.[14]  The

---

[12] Abigail McCormick, *Review: The Social Dilemma* (Aug. 8, 2021) (available at https://sauconpanther.org/2535/arts-and-entertainment/if-youre-not-paying-for-the-product-then-you-are-the-product/).

[13] Center for Humane Technology, *The Attention Economy – Why do tech companies fight for our attention?* (Aug. 17, 2021) (available at https://www.humanetech.com/youth/the-attention-economy).

[14] *See, e.g.*, Meta Careers, *Shape the Future of Marketing with the Marketing Science Team*, Meta (Sept. 19, 2018) (available at https://www.metacareers.com/life/come-build-with-the-facebook-marketingscience-team); *How Virtual Reality Facilitates Social Connection*, Meta, https://www.facebook.com/business/news/insights/how-virtual-reality-facilitates-social-connection

Fig. 5

40.    Content on the "For You" feed is generated by TikTok's artificial intelligence algorithm depending on the content a user liked, interacted with, or searched.

41.    When first downloading the app, the user's account is public by default, meaning that the user's posts are viewable—and the user is findable—by any other individual on the Internet.

42.    In 2021, 63% of surveyed American minors ages 12–17 said they used TikTok every week.[15] In 2022, 67% of surveyed American teens ages 13-17 reported using TikTok, generally, and 16% reported using TikTok "almost constantly."[16]

1.    <u>International Privacy Concerns Regarding TikTok</u>

43.    Notwithstanding TikTok's U.S.-based parent company, ByteDance Inc., TikTok's ultimate parent company is the Chinese-based ByteDance Ltd. This fact has resulted in continuous controversy as, like Instagram, TikTok's true purpose is to harvest personally identifiable data about its users.

44.    The more content the users create and share, the more TikTok learns about them— their interests, their locations, the types of phones they have, the apps on their phones, who their contacts are, their behaviors on- and off-TikTok, their facial features, their voice prints, and much, much more.

45.    Unlike other social media companies, TikTok's ties—and fealty—to a foreign government with much stricter controls on unfettered access to individuals' online data create unique problems, not just from a national security standpoint, but even from a privacy/ethics view. Simply put, TikTok, ByteDance, and their affiliates do not operate with the same norms—much less guardrails—that other social media companies do. Thus this guarantees that the sensitive data provided by TikTok users, including child users, is inherently subject to fewer protections and subjected to more abuses, than that of other social media platforms.

---

[15] Salvador Rodriguez, *TikTok usage surpassed Instagram this year among kids aged 12 to 17, Forrester survey says*, CNBC (Nov. 18, 2021) (available at <u>https://www.cnbc.com/2021/11/18/tiktokusage-topped-instagram-in-2021-among-kids-12-to-17-forrester-.html</u>).

[16] Emily A. Vogels et al., *Teens, Social Media and Technology 2022*, Pew Research Center (Aug. 10, 2022), available at <u>https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/</u>

ways . . . [t]he more likely you are to take an action, and the more heavily we weigh that action, the higher up you'll see the post."[24]

55.    Similarly, in 2021, the New York Times obtained a copy of an internal TikTok document titled "TikTok Algo 101," which purported to explain how the social media platform's algorithms work.[25]  Per the Times article, "The document explains frankly that in the pursuit of the company's 'ultimate goal' of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: 'retention' — that is, whether a user comes back — and 'time spent.'  In sum, "*[t]he app wants to keep you there as long as possible.*"[26]

56.    One technologist quoted in the article went further, stating that the document confirmed

> that watch time is key. The algorithm tries to get people addicted rather than giving them what they really want…[I]t's a crazy idea to let TikTok's algorithm steer the life of our kids…Each video a kid watches, TikTok gains a piece of information on him. In a few hours, the algorithm can detect his musical tastes, his physical attraction, if he's depressed, if he might be into drugs, and many other sensitive information. There's a high risk that some of this information will be used against him. It could potentially be used to micro-target him or make him more addicted to the platform.[27]

57.    The document outlines the rough equation that TikTok uses to make its endless scroll as addictive as possible, relying on three variable – likes, comments, and playtime: "*Plike X Vlike + Pcomment X Vcomment + Eplaytime X Vplaytime + Pplay X Vplay.*"  These variables are then applied to its algorithm, in order to provide the user with a continuous stream of complimentary content (again, with the stated goal of keeping the user on the app for as long as possible).

58.    Alex Zhu, one of the app's founders, explains that continuous engagement is critical: "Even if you have tens of millions of users," Zhu explained, "you have to keep them always engaged."[28]

---

[24] Adam Mosseri, *Shedding More Light on How Instagram Works*, Instagram (June 8, 2021), https://about.instagram.com/blog/announcements/shedding-more-light-on-how-instagram-works ("[W]e make a set of predictions. These are educated guesses at how likely you are to interact with a post in different ways.... The more likely you are to take an action, and the more heavily we weigh that action, the higher up you'll see the post.").
[25] Ben Smith, *How TikTok Reads Your Mind*, New York Times (Dec. 5, 2021) (available at https://www.nytimes.com/2021/12/05/business/media/tiktok-algorithm.html)
[26] *Id.* (emphasis added).
[27] *Id.*
[28] Biz Carson, *How a failed education startup turned into Musical.ly, the most popular app you've probably never heard of*, Bus. Insider (May 28, 2016), https://www.businessinsider.com/what-is-musically-2016-5

59.    Defendants are aware not only of the value of variable rewards for driving users' online time and maximizing profits, but also the risks associated with these types of rewards. For example, in 2020, responding to internal research indicating that teen users had difficulty controlling their use of Facebook and Instagram, a Meta employee wrote to a colleague: "I worry that the driving [users to engage in more frequent] sessions incentivizes us to make our product more addictive, without providing much more value. How to keep someone returning over and over to the same behavior each day? Intermittent rewards are the most effective (think slot machines), reinforcing behaviors that become especially hard to extinguish."



Fig. 6

60.    Amid public concern regarding teenagers' social media use, particularly following the revelations by Congressional whistleblower Frances Haugen, companies have begun to deploy some countervailing measures.  For example, at the end of 2021 Instagram introduced a new feature called "Take A Break" that, when turned on, prompts users to take a break after they have been continuously scrolling for a certain amount of time.[29]

61.    However, it is unknown whether these measures are effective, and in any event, these measures do not resolve the crux of the problem.  For example, the "Take A Break" feature does little to limit the allure of endless scroll because (1) it is an opt-in feature (*i.e.*, it is not automatically enabled) and (2) in the event a user enables it, he or she can simply hit "dismiss" when reminders appear on the screen. Hence, "Take A Break" merely constitutes a single point of friction that does not alter the overall low-friction nature of endless scroll.

---

[29] Adam Mosseri, *Raising the Standard for Protecting Teens and Supporting Parents Online*, About Instagram (Dec. 7, 2021), https://about.instagram.com/blog/announcements/raising-thestandard-for-protecting-teens-and-supporting-parents-online

Instagram recently updated the Take A Break feature to integrate messages from popular content creators into the break reminders. Andrew Hutchinson, *Instagram Adds New Prompts to Reduce Harmful Impacts on Young Users*, Social Media Today (June 14, 2022), https://www.socialmediatoday.com/news/instagram-adds-new-prompts-to-reduce-harmful-impacts-on-young-users/625512/

confidence. Especially knowing that you're not the only one who's able to see it."[36] Not only are children spotting and seeing posts, but now they are obsessing over the popularity of their posts and those of others. These factors all converge to create a feedback loop: because children crave this social reinforcement, they seek it out, but ultimately children are unequipped with the tools to protect themselves against the allure of "rewards" that these manipulative social media designs purportedly promise.[37]

### 1. Quantified Popularity of a Minor's Account or Content

71. This design element "gamifies" a user's popularity by displaying (publicly, privately, or both) the number of friends or connections a user has, the number of interactions their content has received, and sometimes also the names or usernames of specific other users who have interacted with the user or their content. Metrics that may be displayed include views, likes, dislikes, reactions, and comments received on content.

72. These tallies act as quantified proof of popularity and exploit children's natural tendency to pursue social relevance. Defendant Instagram's own internal studies show that "Likes" function as emotional currency. If children's posts get Likes, they feel validated, but the fewer Likes they get, the worse they feel.



**Like counts**
- People receive about 5% as many Likes on their own posts as those they see on IG
- Seeing high Like counts is associated with feeling worse (more negative, less positive comparison)
- The threshold is different for friends (10 Likes) vs. celebrities (10,000 Likes)
- Likes have a bigger impact than comments on negative social comparison.

Fig. 8 – *results of an internal Meta study regarding the effect of Instagram's Like feature on its child audience.*

73. Instagram defaults to showing the number of likes on each post. The platform permits users to hide like and view counts on individual posts, but it does not allow users to

---

[36] Katie Joseff, *Social Media Is Doing More Harm than Good*, Common Sense Media (Dec. 17, 2021), available at https://www.commonsensemedia.org/kids-action/articles/social-media-is-doing-more-harm-than-good

[37] *See* discussion *infra* Section III.B.3, "Minors are more susceptible to social manipulation and peer pressure applied by design features that maximize for online engagement."



Fig. 11 - *Instagram displays the usernames and profile pictures of specific users who have liked a piece of content.*



Fig. 12 - *Instagram automatically sets account profile settings to "Public" for users who are minors, making their account able to be followed by users with whom they have never interacted. Users receive notifications about other users who have started following their account, displaying their username and profile picture.*

79.     Instagram is well aware of this phenomenon, and further understands the harms that it presents to child users. In an internal study, Defendant acknowledged that Instagram "identified

Fig. 10 – *TikTok displays the total number of likes each user*
*has received across all videos.*

2. <u>Named Popularity</u>.

75.    Defendant's platform also utilizes the harmful design element of "named popularity," by displaying the names of specific users who have interacted with a particular piece of content by viewing, liking, disliking, sharing, or commenting on it.

76.    This design element encourages users to engage with content in pursuit of achieving or reinforcing social relevance with particular people, such as close friends or people they perceive as cool or influential.

77.    Beyond inducing minor users to interact with content to appear relevant, this design element punishes minor users if their own content is not interacted with by other, popular users.

78.    In either case, the content being posted on Defendants' platforms becomes a proxy for individual popularity of the minor user, amplifying the worst elements of peer pressure and self-esteem issues, which already are experienced by children.

21

attributes correlated with more negative comparison (high like counts, fashion, specific celebrities…etc.)," but further acknowledged that it was not in its best interest to alter its product to be safer for child users. Instead, the study authors asked: "Considering product & policy constraints and what's going on across the company, which of these areas seem more tractable / where should we focus our efforts? *Are there some that we should avoid?*"



We've identified attributes correlated with more negative comparison (high like counts, fashion, specific celebrities, filtered selfies, specific filters, etc). Considering product & policy constraints and what's going on across the company, which of these areas seem more tractable / where should we focus our efforts? Are there some that we should avoid?

*Fig. 13 – Slide from Defendant Instagram's internal study titled "Social comparison on Instagram."*

80.     The answer, sadly, was a resounding "yes," and Instagram declined to alter its "Like" display protocols.

81.     TikTok's promise of (and pressure to attain) popularity is perhaps even greater:

> For young viewers who see social media influencer as a popular career path, the allure is obvious. Teachers talk about students skipping class to record dances in the bathroom; Buddhist shrines in Nepal feature "No TikTok" signs. John Christopher Dombrowski, a Cornell University student whose TikToks about science facts have earned him 2.8 million followers, told the Information he's paid his college tuition with ad-deal money from Adidas and Lancôme. "Social media is the new American Dream," he said.[38]

### 3.  Interaction Streaks.

82.     Streaks are design features that pressure users to continue an ongoing series of interactions with the service or another user. Defendant is in the process of introducing "Achievement Badges" for its "Reels" feature (i.e., video posts by users). The badges are viewable only to users, and function as a rewards system for continuous posting to the platform. Sample badges include achievements like "Trendspotter" and "Creative Streak," encouraging "content stay[ing] fresh" and making multiple posts over a 7-day period.

---

[38] Drew Harwell, *How TikTok Ate The Internet*, Washington Post (Oct. 14, 2022) (available at https://www.washingtonpost.com/technology/interactive/2022/tiktok-popularity/).

Fig. 14[39]

83.    The achievements/badge system is meant to reward users for continued engagement. A different, but related strategy is to punish users for not engaging. This variant of the "interaction streak" design element was identified by B.F. Skinner as "avoidance," meaning that an individual performs a behavior to avoid a negative outcome.[40]

84.    Defendant's platform utilizes avoidance as a design element by creating ephemeral posts, called "Stories," which disappear 24 hours after being originally posted. Because of the impermanence of Stories, users are incentivized to check their Instagram feeds more often, and for longer periods, so as not to miss out on any posts that may soon vanish. A recent analysis correlated use of Stories with addiction:

---

[39] https://twitter.com/alex193a/status/1580507025431486464?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1580507025431486464%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fpetapixel.com%2F2022%2F10%2F13%2Finstagram-testing-new-achievement-badges-to-incentivize-reels-creators%2F. This image is a detail from the Twitter account of Alessandro Paluzzi, "a developer known for reverse engineering apps and finding early versions of upcoming updates." *Instagram Testing New 'Achievement' Badges to Incentivize Reels Creators*. PetaPixel (Oct. 13, 2022) (available at https://petapixel.com/2022/10/13/instagram-testing-new-achievement-badges-to-incentivize-reels-creators/).

[40] GameQuitters, *Are Video Games Designed to Be Addictive?* (available at https://gamequitters.com/are-video-games-addictive/)

[U]ser engagement with Instagram Stories has a significant positive impact on psychological dependency, denoted by cognitive preoccupation and compulsive use of Instagram Stories. The literature has shown that a high level of engagement plays a predictive role in addictive use of Internet activities, and the findings of this study indicate that users who are highly engaged with Instagram Stories tend to become dependent on it. As users obtain a variety of gratifications from using Instagram Stories, they are likely to become more reliant on it, potentially leading to excessive use. …[Further] it is clear that negative feelings exert an even stronger influence than pleasant feelings on the development of psychological dependency in the current context. On the one hand, the positive feelings that users experience from using Instagram Stories may reinforce their addictive patterns of its usage. On the other hand, because users may also experience negative emotions as a result of engaging in social interactions and self- and identity-related activities using Instagram Stories (e.g., unsuccessful self-promotion, missed opportunities, social comparison), they may become more dependent on the platform to help regulate and alter such mood states with the hope of bringing their affect back to optimal levels. However, this is alarming, as recent studies conducted by Facebook show that frequent use of Instagram could lead to detrimental effects on young users' mental health.[41]

85.    Between positive reinforcement like achievement badges, or conditioning via avoidance (like the Stories feature), Defendant's design elements are meant to—and do—foster addiction to the Instagram platform.

4.    <u>Parasocial Relationship Pressure</u>.

86.    Perhaps because Defendants' platforms are premised on individual users connecting and communicating directly with each other, many celebrities have utilized Instagram and TikTok to reach existing fans and gain new ones.

87.    The practice has become so popular that marketing companies also employ this technique by partnering with "influencers," people with large social media followings who create content centered around products or services, often without it being immediately apparent that they are paid advertisers of said products or services.

88.    While posts from celebrities and influencers may feel unscripted, or otherwise authentic, they are not individual conversations with fans.  Instead, "it remains a one-sided relationship because it is physically impossible for virtual influencers on Instagram to separately know their thousands or millions of fans. Whereas, for fans, it is easier to know more about the

---

[41] Jia-Dai (Evelyn) Lu, Jhih-Syuan (Elaine) Lin, *Exploring uses and gratifications and psychological outcomes of engagement with Instagram Stories*, Computers in Human Behavior Reports, Vol. 6 (May 2022), 100198 (available at https://www.sciencedirect.com/science/article/pii/S245195882200032X) (internal citations omitted).

92.     Critically, Instagram has been identified as the most popular platform for adolescents for establishing parasocial relationships with celebrities and influencers.[49]

93.     Similarly, TikTok's early popularity can be attributed in part to its use of celebrities and, more broadly, pop-culture content meant to appeal to children.  For example, the Federal Trade Commission alleged that the app initially centered around a child-oriented activity (i.e., lip syncing); featured music by celebrities that then appealed primarily to teens and tweens, such as Selena Gomez and Ariana Grande; labelled folders with names meant to appeal to youth, such as "Disney" and "school;" included songs in such folders related to Disney television shows and movies, such as "Can You Feel the Love Tonight" from the movie "The Lion King" and "You've Got a Friend in Me" from the movie "Toy Story;" and songs covering school related subjects or school-themed television shows and movies.[50]  Further, the Internet is replete with articles with titles such as "Celebrities on TikTok: 150+ of the best famous people to follow,"[51] "Celebrities You Need to Follow On TikTok Right Now,"[52] and "A-List Celebrities to Follow on TikTok."[53]

### 5.   Incentivized Reach to Larger Audience.

94.     Games and services also use design features that **incentivize reach to a larger audience**. These platforms encourage and even pressure children to share information about themselves that they otherwise would not share, or to share their content with larger audiences than they originally intended. For example, Instagram frequently prompts passive users to create and share content, rather than merely viewing content created by others. When investigators created an Instagram account for a fictitious 14-year-old, they found that when they scrolled

---

[49] Bond, Bradley J., *Following Your "Friend": Social Media and the Strength of Adolescents' Parasocial Relationships with Media Personae*, available at
https://www.liebertpub.com/doi/full/10.1089/cyber.2016.0355
[50] Complaint for Civil Penalties, Permanent Injunction, and Other Equitable Relief, at p. 8, ¶¶ 26–27, *United States v. Musical.ly*, 2:19-cv-01439-ODW-RAO (C.D. Cal. Feb. 27, 2019) Dkt. # 1.
[51] Dusty Baxter-Wright & Emily Gulla, *Celebrities on TikTok: 150+ of the best famous people to follow*, Cosmopolitan (June 7, 2022) (available at
https://www.cosmopolitan.com/uk/entertainment/a32028959/celebrities-on-tik-tok/).
[52] Nathan Aspell, *Celebrities On TikTok: Pop Star Usernames You Need To Add On TikTok Right Now*, Capital – The UK's No. 1 Music Hit Station (Sept. 22, 2021) (available at
https://www.capitalfm.com/features/follow-celebrities-tiktok/).
[53] Andrea Wurzburger, *Kylie Jenner, Reese Witherspoon and the Rest of the A-List Celebs You Should Be Following on TikTok*, People (Dec. 3, 2020) (available at
https://people.com/celebrity/celebrities-on-tiktok/).

through Reels, they received continual prompts to create our own content using filters and audio that are popular among other users.[54]



Fig. 15 - *As the investigators' fictitious 14-year-old Instagram user scrolled through Reels on the app, she was prompted to create content using effects and audio that are popular among other users*

95.    In many instances, content sharing options default to sharing content publicly or to wider audiences not otherwise directly known to the minor. For example, "Live" videos on Instagram are made public by default. Users can only elect to hide Live videos from users they specify individually.



---

[54] Center for Digital Democracy, Fairplay, et al., *Petition for Rulemaking to Prohibit the Use on Children of Design Features that Maximize for Engagement*, at p. 46 (Nov. 2, 2022) (available at https://fairplayforkids.org/wp-content/uploads/2022/11/EngagementPetition.pdf).

Fig. 16 - *Instagram Live videos are available to everyone unless the user identifies specific individuals they wish to exclude. To block non-followers, the user would have to make their account private.*

96.    Similarly, when Instagram or TikTok users view content, the service suggests other accounts for the user to follow, including accounts followed by other people the user already follows, thereby encouraging users to connect with additional accounts with which they have no actual connection.



Fig. 17 - *Instagram displays "Suggested for You" profiles encouraging the user to follow other accounts.*

mobilization of all these resources indicates that the platform is built not for user experience, but for maximization of profit.

34.     And this maximization of profit is achieved through addiction.  As set forth below, Defendant employs sophisticated principles first identified by psychologists and other academics, which it manifests through intentional design elements that exploit those psychological principles.

35.     These design elements are not subjective—instead they are part and parcel of Instagram's algorithms and code.  They operate consistently, and universally, across the platform, for all users, including the vulnerable children who Defendant knows—to a certainty—are using Instagram.

36.     Worse, still, Defendant's own internal research has proven that fostering addiction to Instagram is harmful for its adolescent user base.  Yet Defendant ignores this information and continues to add features to keep children hooked.

### ii.  TikTok

37.     TikTok is a social media platform that centers on short videos created and uploaded by users and often set to music. TikTok is available as an application ("app") to download on smartphones and tablets, and most TikTok users interact with the platform through its app.

38.     TikTok allows users to create short videos, which often feature music in the background and can be sped up, slowed down, or edited with a filter. They can also add their own sound on top of the background music. To create a music video with the app, users can choose background music from a wide variety of genres, edit with a filter, and record a 15-second video with speed adjustments before uploading it to share with other TikTok users.

39.     The principal interface of the app is the "For You" feed, which is an endless list of videos that are recommended to users based on their activity on the app.



## B. DEFENDANTS UTILIZE MULTIPLE DESIGN PRACTICES PURPOSELY INTENDED TO HOOK CHILDREN AND KEEP THEM ON THEIR PLATFORMS IN PERPETUITY.

46.     Maximizing children's time and activities online harms them in a variety of concrete and serious ways, but when children use digital platforms, they are nevertheless besieged with features designed to maximize online time and activities. Children encounter these features everywhere, and the manipulation tactics will continue to become more extreme.[17]

47.     Three categories of engagement-optimizing design features are especially pernicious: low-friction variable rewards design features, navigation manipulation design features, and social manipulation design features.

### i. Low-Friction Variable Rewards (a/k/a the "Hook Model")

48.     The "Low-Friction Variable Reward" design element (also called the "Hook Model"[18]) is a powerful cognitive manipulation principle, first identified by the famous psychologist B.F. Skinner in the early 20th Century.[19] It is premised on the observation that when test subjects—both humans and other animals—are rewarded unpredictably for a given action, they will engage in the action for a longer period of time than if the reward is predictable.[20] In his testing, Skinner observed that lab mice responded voraciously to random rewards. The mice would press a lever and sometimes they'd get a small treat, other times a large treat, and other times nothing at all. Unlike the mice that received the same treat every time, the mice that received variable rewards seemed to press the lever compulsively.

49.     At a chemical level, this is because the brain generates more dopamine in response to an uncertain reward than in response to an expected and reliable one.[21] The tendency of variable

---

[17] *Compare* Marisa Meyer et al., *Advertising in Young Children's Apps: A Content Analysis*, 40 Journal of Developmental and Behavioral Pediatrics (Aug. 2018), https://www.childrenstech.com/files/2018/11/Advertising_in_Young_Children_s_Apps___A_Content.99257.pdf
*with* Jenny Radesky et al., *Prevalence and Characteristics of Manipulative Design in Mobile Applications Used by Children*, 5 JAMA Network Open 1 (June 17, 2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2793493
[18] Bart Krawczyk, *What is the hook model? How to build habit-forming products*, Log Rocket Frontend Analytics (Dec. 2, 2022) (available at https://blog.logrocket.com/product-management/what-is-the-hook-model-how-to-build-habit-forming-products/).
[19] B. F. Skinner, *Two Types of Conditioned Reflex: A Reply to Konorski and Miller*, 16 J. Gen. Psychology, 272-279 (1937), available at https://doi.org/10.1080/00221309.1937.9917951).
[20] Laura MacPherson, *A Deep Dive into Variable Designs and How to Use Them*, DesignLi (Nov. 8, 2018), https://designli.co/blog/a-deep-dive-on-variable-rewards-and-how-to-use-them/ Mike Brooks, *The "Vegas Effect" of Our Screens*, Psychol. Today (Jan. 4, 2019), https://www.psychologytoday.com/us/blog/tech-happy-life/201901/the-vegas-effect-our-screens
[21] Anna Hartford & Dan J. Stein, *Attentional Harms and Digital Inequalities*, 9 JMIR Mental Health 2, 3 (Feb. 11, 2022), https://pubmed.ncbi.nlm.nih.gov/35147504/

rewards to drive compulsive behavior is sometimes referred to as the "Vegas Effect," and is the primary mechanism at work in slot machines, keeping players sitting in front of machines for hours on end.[22]

50.    Humans, like the mice in Skinner's experiments, crave predictability and struggle to find patterns, even when none exist. Variability is the brain's cognitive nemesis, and our minds prioritize the deduction of cause and effect over other functions like self-control and moderation.

51.    One example of variable rewards design feature is the infinite or **endless scroll mechanism** with variable content that is deployed across social media platforms. When a platform uses endless scroll, a user is continuously fed more pieces of content, with no endpoint, as they scroll down a feed or page. When platforms load content into streams viewed by endless scroll, a user can never predict what will come next or how interesting it will be. The user is rewarded at unpredictable intervals and levels with pieces of content they find funny, entertaining, or otherwise interesting.[23]

52.    Critically, the action required by the user is "low-friction" – that is to say, there is little commitment required of the user beyond simply scrolling through the app.  This enables the user to engage in the pursuit of the next "rewarding" piece of content in perpetuity.

53.    Both Instagram and TikTok employ the endless scroll, supplying minor users with unpredictable variable rewards by strategically and intermittently surfacing content that the respective platforms predict users will want to see.  But they are not just making a "lucky" guess about the type of content that children- and others- would wish to engage. Rather, their predictions are incredibly precise and "effective" as they are made because both Instagram and TikTok siphon private and personal user data to create individualized user "profiles"—including of children who uses the apps.

54.    A blog post by Adam Mosseri, head of Instagram, explains, "[W]e make a set of predictions. These are educated guesses at how likely you are to interact with a post in different

---

("At the level of our neural reward system, an uncertain reward generates a more significant dopamine response than those generated by a reliable reward.").

[22] Mike Brooks, *The "Vegas Effect" of Our Screens*, Psychol. Today (Jan. 4, 2019) (available at https://www.psychologytoday.com/us/blog/tech-happy-life/201901/the-vegas-effect-our-screens).

[23] GCFGlobal.org, *Digital Media Literacy: Why We Can't Stop Scrolling*, https://edu.gcfglobal.org/en/digital-media-literacy/why-we-cant-stop-scrolling/1/

62. Similarly, TikTok recently introduced some new features that prompt users who spend more than 100 minutes in the app to consider taking a break.[30] However, this is merely a suggestion, and the value of mentioning to an addict that they may want to cease engaging in their addiction is not a particularly effective tool.

63. Moreover, the prompt only appears the *next* time the user opens the app, and does nothing to limit the current session, even after the 100-minute mark.[31]

#### ii. Navigation manipulation

64. This endless scroll feature, employed by both TikTok and Instagram, also functions as a form of navigation manipulation—a design element that is meant to frustrate users from navigating away from the app or to engage in an activity on the app that is beneficial to the user, but which frustrates the incentives of the app (constant, limitless use).

65. Endless scroll makes it harder for a child to leave Instagram and TikTok—the content (i.e., the reason for using the app) never ends. There is always another post (and another ad) ready to be loaded into the child's feed. This manipulation of navigation undermines user autonomy and is implemented to maximize user time and activity at the expense of user safety.

66. Another form of navigation manipulation called "**AutoPlay**," is similar to endless scrolling, and is especially prevalent on social media platforms (like Instagram and TikTok) that provide video content for users. Simply put, once one video is over, another one begins without any further prompting from the user.

---

[30] Jordan Furlong, *Investing in Our Community's Digital Well-Being*, TikTok Newsroom (June 9, 2022), https://newsroom.tiktok.com/en-us/investing-in-our-communitys-digital-well-being.
[31] *Id.*



Fig. 7 - *When an Instagram user views stories of an account they follow, once the timer bar at the top of the screen becomes opaque, they are automatically presented with either the next story posted by that account, or another account's story reel.*

67.     AutoPlay takes away a user's sense of control, increasing the chances of binge-watch or going down a "rabbit hole." Moreover, because there is no longer any user choice in the interaction (Instagram and TikTok choose what videos will be played next), there is an increased risk of children being exposed to inappropriate, harmful content.

### iii.    Social manipulation

68.     Defendants utilize **social manipulation** to keep children addicted to their platforms. At its most basic form, this design practice leverages a child's desire for social relationships in order to encourage more time spent on the platform and more engagement with the platform (which in turn leads to more opportunities for Defendant to monetize the child users). In a recent petition to the FTC, a consortium of child advocacy groups identified five sub-categories of social manipulation design elements:[32]

   a.  **Quantified Popularity of a Minor's Account or Content.** Displaying a quantified tally of the number of connections or interactions for a minor's account or piece of content, such as followers, views, likes, dislikes, or comments.

   b.  **Named Popularity.** Displaying the names, usernames, or other known identifiers of specific other users who have interacted with a particular piece of content, such as by viewing, liking, disliking, or commenting on it.

---

[32] Center for Digital Democracy, Fairplay, et al., *Petition for Rulemaking to Prohibit the Use on Children of Design Features that Maximize for Engagement*, at p. 32 (Nov. 2, 2022) (available at https://fairplayforkids.org/wp-content/uploads/2022/11/EngagementPetition.pdf).

c. **Interaction Streaks.** Features that quantify interactions between users, creating pressure for interactions to continue so that the streak value continues to increase.

d. **Parasocial Relationship Pressure.** The use of an artificial or animated character or a popular influencer on a website or service to pressure or shame a minor into taking a certain action, such as when a game character uses insulting language or pressure to manipulate the minor into continuing to play a game, coming back at another time, making a purchase, or sharing personal information.

e. **Incentivized Reach to Larger Audience.** Prompting a minor to make their account visible to, or otherwise share content with, users with whom they are not already connected, or defaulting to these settings.

69.      Children are particularly vulnerable to social manipulation techniques. Younger adolescents have specific developmental needs for social connectedness and are particularly attuned to social validation.[33] This can "lead to greater relinquishing of security in certain arenas to gain social validation and belonging, for example, disclosing publicly to participate in online communities and accrue large amounts of likes, comments, and followers."[34]   One pair of researchers investigating the phenomena writes:

> [T]o tweens and teens, the kind of "rewards" social media promise are even more meaningful. Teens are primed to crave and value social validation, which is part of how they make sense of where they fit into their social worlds. Their biological sensitivity to social feedback makes them more susceptible to the pull of social media, which is at the ready with a promise of 24/7 access to likes and praising comments. Capacities for self-regulation and impulse control are also a work in progress during the teen years, which adds to the challenge of pulling away.[35]

70.      Many social manipulation design features induce anxiety in children that they or their content may not be as popular as that of their peers. In the words of a Massachusetts high school student who spoke with Common Sense Media, "[I]f you get a lot of likes, then 'Yay,' you look relevant, but then if you don't get a lot of likes and/or views, it can completely crush one's

---

[33] Nicholas D. Santer et al., *Early Adolescents' Perspectives on Digital Privacy,* Algorithmic Rights and Protections for Children (2021) at 6, 30.

[34] *Id.* at 6 (citing J.C. Yau & S. M. Reich, *"It's Just a Lot of Work": Adolescents' Self-Presentation Norms and Practices on Facebook and Instagram,* 29 J. Res. on Adolescence 196, 196-209 (2019)).

[35] Emily Weinstein & Carrie James, *Behind Their Screens: What Teens Are Facing (And Adults Are Missing),* MIT Press, at 33 (2022) (citing Lucy Foulkes and Sarah-Jayne Blakemore, *Is There Heightened Sensitive to Social Reward in Adolescence?,* 40 Current Opinion Neurobiology 81 (2016)).

permanently switch this setting for all their posts at once. Instead, if a user wishes to hide these metrics for their posts, the user must make that election on a post-by-post basis.



Fig. 9 - *A user who wishes to avoid displaying like and view metrics*
*for their Instagram posts must make that election on a post-by-post basis.*

74.    Likewise, TikTok displays quantified popularity metrics for each user's account, as well as for each video shared on its platform.

one or two celebrities they follow. There is a term for this concept called 'parasocial interaction' used in psychology or media communication."[42]

89.    The concept of a parasocial relationship was coined in 1956 by Donald Horton and R. Richard Wohl to describe the way mass media users acted like they were in a typical social relationship with a media figure, such as feeling as though they are friends with a radio personality or a TV character.[43] The definition of a parasocial relationship is when an individual becomes attached to and invested in a media character (be they real or fictional) who doesn't return the emotion. A sense of intimacy and closeness develops on one side but the other party, in all likelihood, does not know the former exists.[44]

90.    Some fans get so engrossed by their online idols they start caring about their lives more than about what is happening in their own life. They enjoy watching for entertainment, and at the same time, they're prepared to defend their idols by any means, even by attacking fans of other streamers or influencers, creating a toxic online environment.[45]

91.    The most common population groups that develop parasocial relationships are teenagers and young adolescents. These relationships also happen with people who feel lonely or lack self-esteem.[46] The parasocial relationships between teens and social media influencers are growing faster. In 2015, nine percent of teens aged 13 to 17 had a "media influence" online. This number increased by 12 percent in 2017. Young people who experience bullying are also more likely to develop parasocial relationships.[47] Many young people are not comfortable with establishing relationships in real life. They don't have a social circle or a group of friends they can rely upon. Therefore, they turn to their online idols as a form of self-esteem boosting and social interaction.[48]

---

[42] Hayya Zahra, *Virtual Influencers: Parasocial Interaction on Instagram*, LNN (Sept. 14, 2021) (available at https://www.linknewsnetwork.com/virtual-influencers-parasocial-interaction-on-instagram/).
[43] Sadhbh O'Sullivan, *The Internet Is Obsessed With Parasocial Relationships*, Refinery29 *Oct. 4, 2021) (available at https://www.refinery29.com/en-gb/parasocial-relationships-online-cancelling-bon-appetit).
[44] *Id.*
[45] GameQuitters, *Parasocial Relationships: What are They, and Are They Bad?* (available at https://gamequitters.com/parasocial-relationships/).
[46] *Id.*
[47] *Id.*
[48] *Id.*



*Fig. 18 - TikTok will have nudges for users to watch other popular videos. These nudges were made on an account registered as a 14-year-old that was not following any other users.*

97.     This incentivization serves to maintain the minor's connection to Instagram and TikTok. The more friends a user has on a given platform, the more incentivized the user is to spend time on that app or service, and the more activities they will engage in while there. Further, when a user utilizes an "invite friends" function, the platform often accesses the user's private contacts. Ultimately then, the minor, because they are incentivized to reach a larger audience, shares more data and information than they likely would have otherwise.

98.     Of course, the larger the audience, the more attenuated the online relationships become, and children are uniquely suited to be abused or otherwise harmed by strangers on the Internet.  In 2020, reports of online child predator incidents spiked more than 97%, according to the National Center for Missing & Exploited Children. And, according to the FBI, each offender may sexually extort dozens—sometimes hundreds—of young victims.[55]

99.     Similarly, cyberbullying poses a substantial risk. According to a Pew Research study, nearly 60% of teenagers have encountered bullying or harassment online. As one's social media "friend" network becomes more attenuated, the child user risks carelessly sent cruel messages and posts.

100.    Finally, harm results from a child user's unfiltered access to a medium that lasts forever.  Children fail to appreciate both the short-term and the long-term consequences of what they choose to put online. After all, it's often as simple as applying a filter and pressing the "post" icon. Sharing personal information is bad enough, as it opens the door to scammers and predators, but children additionally underestimate the reach of their choices on social media. Even though they have the option to delete what they post, anything put online should be considered permanent. Their posts can easily be screenshotted or otherwise downloaded and shared publicly by someone

---

[55] Hillary Back, *8 Common Threats to Kids on Social Media*, Experian (June 7, 2021) (available at https://www.experian.com/blogs/ask-experian/common-threats-to-kids-on-social-media/).

else, whether or not they want it to be. Their posts can follow them for a long time, leading to disciplinary action at school as well as potentially compromising future education or career opportunities.

## C. THE VULNERABILITIES OF ADOLESCENT BRAINS MAKE ADOLESCENTS MORE SUSCEPTIBLE TO THE HARMS OF DEFENDANTS' PLATFORMS

### i. The Adult Brain and the Adolescent Brain Have Structural Disparities

101.    During adolescence, the transition between childhood and adulthood, the two parts of the brain that regulate behavior, the limbic system (associated with survival) and the prefrontal cortex (associated with higher-level functions), develop simultaneously, but asynchronously[56] with the limbic system maturing years before the prefrontal cortex. The brain's frontal lobe is last to fully develop, not maturing until closer to adulthood.[57]

102.    The limbic system, located mainly in the medial temporal lobe and responsible for emotion, memory formation, sexual arousal, and learning, operates subconsciously, continuously processing sensory input from internal and external stimuli to elicit appropriate autonomic and behavioral responses.[58] Within the limbic system is the amygdala, which controls certain emotional responses (fear, anxiety) that activate immediate and instinctive behavior such as the "fight, flight, or freeze" response to perceived danger.[59]

103.    Situated in the front-most area, right behind the forehead, the prefrontal cortex is responsible for executive functioning skills such as planning, problem solving, reasoning, and impulse control.[60] The prefrontal cortex has three substructures: the medial frontal, which makes it possible to pay attention and concentrate; the orbitofrontal cortex, which helps prevent reckless behavior or emotional outbursts; and the lateral prefrontal, which processes complex information and evaluating different courses of actions.[61]

104.    The limbic system and the prefrontal cortex, when fully matured, operate in tandem to balance emotion and cognition. Thus, in the adult brain, the prefrontal cortex acts as a

---

[56] B.J. Casey et al., *The Adolescent Brain*, 28 DEVELOPMENTAL REV. 62, 63 (2008).
[57] *Id.*
[58] *See* Velayudhan Rajmohan and Eladath Mohandas, *The Limbic System*, 49 INDIAN J. OF PSYCHIATRY 132–39 (2007) (providing an overview of the components and functions of the limbic system).
[59] Ralph Adolphs, *The Biology of Fear*, 23 CURRENT BIOLOGY 79, 83–85 (2013).
[60] Edward E. Smith and John Jonides, *Storage and Executive Processes in the Frontal Lobes*, 283 SCIENCE 1657, 1659–60 (1999).
[61] Joaquin M. Fuster, *The Prefrontal Cortex–An Update: Time is of the Essence*, 30 NEURON 319, 320–21 (2001).

counterbalance to the limbic system, making it possible for an adult to consider long term consequences and control impulses.[62]

### ii. The Anatomical Differences Between the Adult & Adolescent Brains Cause Adults and Adolescents to Respond to Stimuli Differently

105.    The mismatch in growth rates between the prefrontal cortex and the limbic system is responsible for structural differences between the adult brain and the adolescent brain. Magnetic resonance imaging shows that there are far more cellular connections in a developed prefrontal cortex. For example, the adult brain's frontal lobes have more white matter,[63] or myelin, which is composed of millions of bundles of axons that connect neurons in different brain regions into functional circuits.[64] During adolescence, white matter increases in the corpus callosum, which is the bundle of nerve fibers that connect the left and right hemispheres of the brain, increasing myelination.[65] The growth of white matter allows the two hemispheres to effectively communicate with each other, and enables an individual to use a range of analytical and creative strategies to respond to external stimuli.[66]

106.    Studies show that adults process information using the prefrontal cortex whereas adolescents rely on the limbic system.[67] When the prefrontal cortex is active, there is less activity in the amygdala, making it easier for adults to make sound decisions faster than adolescents.[68] Functional brain imaging also shows that responses to external stimuli occur in the limbic system when the prefrontal cortex is not fully developed.[69] Without a fully developed prefrontal cortex, adolescents are more likely than adults to be swayed by their emotions and exhibit more impulsive behavior, rather than a logical or measured response.[70] Until the prefrontal cortex reaches the same level of maturity as the limbic system, the desire for rewards overpowers rational thinking.

### D. DEFENDANTS' ADDICTIVE DESIGN PRACTICES CAUSE SUBSTANTIAL INJURY TO CHILDREN.

---

[62] See Angela Griffin, *Adolescent Neurological Development and Implications for Health and Well-Being*, 5 HEALTHCARE 62, 63 (2017) (describing how the prefrontal cortex is late-evolving and enables individuals to learn how to manage long term planning, monitor what is going on, and adjusting smoothly to surroundings while keeping emotions and behaviors context appropriate).

[63] Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE TREATMENT 449, 453–54 (2013).

[64] R. Douglas Fields, *Changes in the Brain's White Matter*, 330 SCIENCE 768, 768 (2010).

[65] Arain et al., *supra* note 63 at 453–54.

[66] *Id.*

[67] Casey et al., *supra* note 56, at 63.

[68] David R. Roalf et al., *More is Less: Emotion Induced Prefrontal Cortex Activity Habituates in Aging*, 32 NEUROBIOLOGY OF AGING 1634, 1635 (2011).

[69] Arain et al., *supra* note 63, at 453.

[70] *Id.*

107.    Defendants' purposely-addictive design features—meant to maximize children's time and activities on social media platforms—are deeply harmful to children's health and safety. As the Surgeon General has observed, "[b]usiness models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . This translates to technology companies focusing on maximizing time spent, not time well spent."[71] By maximizing time and activities online, the design features at issue in this Petition harm children's mental health, foster problematic internet use by children, damage children's physical health, exacerbate children's privacy harms, increase children's risk of contact with dangerous or harmful people, and increase children's exposure to age-inappropriate and otherwise harmful content.

### i.  Harm to Overall Mental Health

108.    Maximizing children's time and activities online is linked with worse psychological well-being in children in concrete and serious ways that cannot be ignored in the context of the current youth mental health crisis.

109.    Heavy users of digital media are more likely to be unhappy, to be depressed, or to have attempted suicide.[72] According to researchers reporting on the results of two nationally representative surveys of U.S. adolescents in grades 8 through 12, "the results show a clear pattern linking screen activities with higher levels of depressive symptoms/suicide-related outcomes and non-screen activities with lower levels."[73] The researchers reported that suicide-related outcomes became elevated after two hours or more a day of electronic device use.[74] Among teens who used electronic devices five or more hours a day, a staggering 48% exhibited at least one suicide risk factor.[75] Of particular concern, a large and growing body of research indicates a strong link between time spent on social media—some of the services most known for using engagement-

---

[71] Protecting Youth Mental Health: The U.S. Surgeon General's Advisory 25 (2021), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf
[72] Jean M. Twenge & W. Keith Campbell, *Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets*, 90 Psychol. Q., 311 (2019).
[73] Jean M. Twenge et al., *Increases in Depressive Symptoms, Suicide-Related Outcomes, and Suicide Rates Among U.S. Adolescents After 2010 and Links to Increased New Media Screen Time*, 6 Clinical Psychol. Sci. 3, 9 (2018). *See also generally* Jane Harness et al., *Youth Insight About Social Media Effects on Well/Ill-Being and Self-Modulating Efforts*, 71 J. Adolescent Health, 324-333 (Sept. 1, 2022); Amy Orben et al., *Windows of Developmental Sensitivity to Social Media*, 13 Nature Comm., 1649 (2022).
[74] *Id.*
[75] *Id.*

maximizing techniques—and serious mental health challenges.[76] Longer and more frequent social media use is associated with depression,[77] anxiety,[78] and suicide risk factors.[79]

110.    Even if some of these documented associations are explained by children's underlying emotional challenges, the design features that are the subject of this Petition have differential negative effects on these youth. For example, children with more negative emotionality may seek endless scrolling as a means of dissociating from emotional distress,[80] yet may be recommended more negative content based on their previous behavior.[81] Children with weaker impulse control may seek out video games as a satisfying activity, but may be more susceptible to the manipulative design patterns common in popular games, such as interaction-by-design (asking users to return to the game, even overnight, to obtain rewards), leading to less time sleeping.

### ii.  Harm to Body Image

111.    Design features that maximize time spent on social media can also lead to heightened exposure to negative body image–related content, which increases children's susceptibility to poor body image and, consequently, disordered eating. A study of data from 7th and 8th graders published in 2019 in the *International Journal of Eating Disorders* "suggest[ed] that [social media], particularly platforms with a strong focus on image posting and viewing, is associated with elevated [disordered eating] cognitions and behaviors in young adolescents."[82] In another study, researchers found a positive correlation between higher Instagram use and

---

[76] *See, e.g.*, K.E. Riehm et al., *Associations Between Time Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth*, 76 JAMA Psychiatry, 1266 (2019), https://doi.org/10.1001/jamapsychiatry.2019.2325;
N. McCrae et al., *Social Media and Depressive Symptoms in Childhood and Adolescence: A Systematic Review*, 2 Adolescent Res. Rev., 315 (2017), https://doi.org/10.1007/s40894-017-0053-4;
H. Allcott et al., *The Welfare Effects of Social Media*, 110 Econ. Rev. Am. 629 (2020), https://www.aeaweb.org/articles?id=10.1257/aer.20190658.
[77] Jean M. Twenge & W. Keith Campbell, *Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets*, 90 Psychol. Q., 312 (2019).
[78] Royal Society for Public Health, *#StatusOfMind: Social Media and Young People's Mental Health and Wellbeing* 8 (May 2017).
[79] Jean M. Twenge & W. Keith Campbell, *Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets*, 90 Psychol. Q., 311 (2019).
[80] Amanda Baughan et al., *"I Don't Even Remember What I Read": How Design Influences Dissociation on Social Media*, CHI Conference on Human Factors in Computing Systems, 1-13 (2022), https://dl.acm.org/doi/pdf/10.1145/3491102.3501899.
[81] Kait Sanchez, *Go Watch this WSJ investigation of TikTok's Algorithm*, The Verge, (July 21, 2021, 2:28 PM), https://www.theverge.com/2021/7/21/22587113/tiktok-algorithm-wsjinvestigation-rabbit-hole.
[82] Simon M. Wilksch et al., *The Relationship Between Social Media Use and Disordered Eating in Young Adolescents*, 53 Int. J. Eat. Disord. 96, 104 (2020).

orthorexia nervosa diagnoses.[83]   Personal stories from sufferers of disordered eating have highlighted the link to social media.[84]

112.    Time spent on social media can harm children's body image and increase their susceptibility to disordered eating in multiple ways. First, visual social media platforms trigger social comparison as children compare their appearance to others, including influencers. For example, an exploratory study performed internally at Meta concluded that 66% of teen girls on Instagram experienced negative social comparison, and 52% of those who experienced negative social comparison attributed this experience to viewing images on the platform that were related to beauty.[85] The documents Frances Haugen shared with the *Wall Street Journal* in 2021 revealed that Facebook has been aware at least since 2019 that "[w]e make body image issues worse for one in three teen girls."[86] Haugen has explained how this becomes a vicious feedback cycle for children: they feel bad about themselves so they go to social media for distraction in order to self-soothe, only to end up seeing the type of posts that led to their anxiety in the first place.[87] Negative self-comparison on social media is experienced by cisgender girls and boys; specifically, boys feel pressure to lose weight and build muscle as a result of the muscular men they see on TikTok, Instagram, and YouTube. Eliot, a 17-year-old, told the *New York Times*, "Girls discuss those pressures more, but it's completely the same for boys."[88]

---

[83] Pixie G. Turner & Carmen E. Lefevre, *Instagram Use Is Linked to Increased Symptoms of Orthorexia Nervosa*, 22 Eating Weight Disorders 277, 281 (2017).

[84] *See, e.g.*, Jennifer Neda John, *Instagram Triggered My Eating Disorder*, Slate (Oct. 14, 2021), https://slate.com/technology/2021/10/instagram-social-media-eating-disorder-trigger.html; Clea Skopeliti, *'I Felt My Body Wasn't Good Enough': Teenage Troubles with Instagram*, The Guardian (Sept. 18, 2021), https://www.theguardian.com/society/2021/sep/18/i-felt-mybody-wasnt-good-enough-teenage-troubles-with-instagram.

[85] *Spence v. Meta Platforms*, N.D. Cal. Case No. 3:22-cv-03294 at 9 (June 6, 2022) (citing Facebook Papers: "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US" (March. 2020), at p. 8).

[86] Georgia Wells et al., *Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show*, W.S.J. (Sept. 14, 2021), https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-forteen-girls-company-documents-show-11631620739.

[87] Allison Slater Tate, *Facebook Whistleblower Frances Haugen Says Parents Make 1 Big Mistake with Social Media*, TODAY (Feb. 7, 2022, 7:06 PM EST), https://www.today.com/parents/teens/facebook-whistleblower-frances-haugen-rcna15256.

[88] Alex Hawgood, *What Is 'Bigorexia'?*, N.Y. Times (Mar. 5, 2022, updated May 17, 2022), https://www.nytimes.com/2022/03/05/style/teen-bodybuilding-bigorexia-tiktok.html.



Fig. 19 - *A slide from an internal presentation at Meta indicates that "beauty"-related content on Instagram drives negative social comparison among teen girls.[89]*

113.    Second, platforms use algorithms to deliver content related to topics or themes that the platform believes will maximize a user's time spent on the platform. These recommendation systems create "bubbles" or "rabbit holes" of content around a specific theme and also expose users to increasingly extreme content on a given topic.[90] This has proven true for negative body image and pro-eating disorder content.[91] Indeed, research shows that social media platforms' content selection algorithms have pushed disordered eating and harmful diet techniques to teenage girls.[92] Girls who express an interest in dieting or dissatisfaction with their looks are bombarded with content targeted to these insecurities and often pushed to more extreme content such as pro-anorexia posts and videos. And because platforms know teenage girls disproportionately engage with this type of content,[93] even minor users who do not express interest in these topics are often delivered this content.

114.    The harm that social media does to children's body image and eating habits has been widely discussed in public discourse in recent months, but even as of the filing of this Petition, content depicting disordered eating remains widely available to children and profitable to

---

[89] *Teen Girls Body Image and Social Comparison on Instagram–An Exploratory Study in the U.S.*, W.S.J. at 9 (Sept. 29, 2021), https://s.wsj.net/public/resources/documents/teen-girls-bodyimage-and-social-comparison-on-instagram.pdf.

[90] Fairplay, *Designing for Disorder: Instagram's Pro-eating Disorder Bubble* at 1 (Apr. 2022), https://fairplayforkids.org/wp-content/uploads/2022/04/designing_for_disorder.pdf; *Inside TikTok's Algorithm: A WSJ Video Investigation*, W.S.J. (July 21, 2021), https://www.wsj.com/articles/tiktok-algorithm-video-investigation-11626877477.

[91] Fairplay, *Designing for Disorder: Instagram's Pro-eating Disorder Bubble* at 6-7 (Apr. 2022), (available at https://fairplayforkids.org/wp-content/uploads/2022/04/designing_for_disorder.pdf).

[92] *See generally id.*; Jim Waterson & Alex Hern, *Instagram 'Pushes Weight-Loss Messages to Teenagers'*, The Guardian (Jul 19, 2021, 7:01 AM), https://www.theguardian.com/society/2021/jul/20/instagram-pushes-weight-loss-messages-to-teenagers.

[93] *See* Fabrizio Bert et al., *Risks and Threats of Social Media Websites: Twitter and the Proana Movement*, 19 Cyberpsychology, Behav. Soc. Networking (Apr. 2016), https://pubmed.ncbi.nlm.nih.gov/26991868/.

platforms,[94] and even popular among teens, who are exposed to more of it as they spend more time online.

### iii. Risks of Problematic Internet Use

115.    Maximizing time and activities online also fosters "problematic internet use"— psychologists' term for excessive internet activity that exhibits addiction, impulsivity, or compulsion.[95] Indeed, the design features discussed in this Petition plainly impede children's ability to put their devices down, even when they want to use them less. For example, a high school student told Common Sense Media,

> One of the challenges I face with social media is getting off it. Once I get on, I have to really force myself off it because it's so addictive. All I'm doing is scrolling, but I'm subconsciously looking for an end so I can feel accomplished. But the scrolling never stops.[96]

116.    This experience reflects the majority of adolescents. A 2016 nationwide survey of children ages 12 to 18 found that 61% of teens thought they spent too much time on their mobile devices, and 50% felt "addicted" to them.[97] In a 2022 Pew Research survey, 35 percent of teens said they are on YouTube, TikTok, Instagram, Snapchat, or Facebook "almost constantly."[98] Over half of teens who describe being online or on social media "almost constantly" said they use social media platforms too much.[99]

117.    Problematic internet use, in turn, is linked to a host of additional problems. For example, in one study of 564 children between the ages of 7 and 15 spearheaded by the Child Mind Institute in New York, researchers found that problematic internet use was positively associated with depressive disorders, Attention Deficit Hyperactivity Disorder, general impairment, and

---

[94] Fairplay, *Designing for Disorder: Instagram's Pro-eating Disorder Bubble* (Apr. 2022), (available at https://fairplayforkids.org/wp-content/uploads/2022/04/designing_for_disorder.pdf)
[95] Chloe Wilkinson et al., *Screen Time: The Effects on Children's Emotional, Social, and Cognitive Development* at 6 (2021), https://informedfutures.org/wp-content/uploads/Screen-time-The-effects-on-childrens-emotional-social-cognitive-development.pdf.

[96] Katie Joseff, *Social Media Is Doing More Harm than Good*, Common Sense Media (Dec. 17, 2021), https://www.commonsensemedia.org/kids-action/articles/social-media-is-doing-more-harm-than-good.
[97] Common Sense, *Dealing with Devices: Parents* 10-11 (2016), https://www.commonsensemedia.org/sites/default/files/research/report/commonsense_dealingwithdevices-topline_release.pdf.
[98] Emily A. Vogels et al., *Teens, Social Media and Technology 2022*, Pew Research Center (Aug. 10, 2022), https://www.pewresearch.org/internet/2022/08/10/teens-social-media-andtechnology-2022.
[99] *Id.*

increased sleep disturbances.[100]  A meta-analysis of peer-reviewed studies involving cognitive

findings associated with problematic internet use in both adults and adolescents found "firm

evidence that PIU . . . is associated with cognitive impairments in motor inhibitory control,

working memory, Stroop attentional inhibition and decision-making."[101]  Another study of over

11,000 European adolescents found that among teens exhibiting problematic internet use, 33.5%

reported moderate to severe depression; 22.2% reported self-injurious behaviors such as cutting;

and 42.3% reported suicidal ideation.[102] The incidence of attempted suicide was also ten times

higher for teens exhibiting problematic internet use than their peers who exhibited healthy internet

use.[103]

### iv. Harm to Physical Health

118.    Maximizing children's time spent online at the expense of sleep or movement also

harms children's physical health. When children are driven to spend more time online, they sleep

less—because it is impossible to be online and sleep at the same time, because stimulation before

bedtime disrupts sleep patterns, and because many of the design features discussed in this Petition

make users feel pressured to be connected constantly, and that feeling doesn't always go away at

nighttime. Indeed, research shows that children who exhibit problematic internet use often suffer

from sleep problems.[104] One-third of teens say that at least once per night, they wake up and check

their phones for something other than the time, such as to check their notifications or social

media.[105] Some teens set alarms in the middle of the night to remind them to check their

notifications or complete video game tasks that are only available for a limited time.[106] In addition,

---

[100] Restrepo et al., *Problematic Internet Use in Children and Adolescents: Associations with Psychiatric Disorders and Impairment*, 20 BMC Psychiatry 252 (2020), https://doi.org/10.1186/s12888-020-02640-x.
[101] Konstantinos Ioannidis et al., *Cognitive Deficits in Problematic Internet Use: Meta-Analysis of 40 Studies*, 215 British Journal of Psychiatry 639, 645 (2019), https://pubmed.ncbi.nlm.nih.gov/30784392/.

[102] Michael Kaess et al., *Pathological Internet use among European adolescents: psychopathology and self-destructive behaviours*, 23 Eur. Child & Adolescent Psychiatry 1093, 1096 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4229646/.
[103] *Id.*
[104] Restrepo et al., *Problematic Internet Use in Children and Adolescents: Associations with Psychiatric Disorders and Impairment*, 20 BMC Psychiatry 252 (2020), (available at https://doi.org/10.1186/s12888-020-02640-x).
[105] Common Sense, *Screens and Sleep: The New Normal: Parents, Teens, Screens, and Sleep in the United States* at 7 (2019), https://www.commonsensemedia.org/sites/default/files/research/report/2019-new-normal-parents-teens-screens-and-sleep-united-states-report.pdf.
[106] Emily Weinstein & Carrie James, *Behind Their Screens: What Teens Are Facing (And Adults Are Missing)*, MIT Press, at 31 (2022).

screen time before bed is known to inhibit academic performance in children.[107] Teenagers who use social media for more than five hours per day are about 70% more likely to stay up late on school nights.[108] A lack of sleep in teenagers has been linked to inability to concentrate, poor grades, drowsy-driving incidents, anxiety, depression, thoughts of suicide, and even suicide attempts.[109]

119.    Decades of research have shown that more time online is consistently correlated with children's risk of obesity, which in turn increases their risk of serious illnesses like diabetes, high blood pressure, heart disease, and depression.[110]  Spending time online displaces time when children could be engaging in physical activity.[111] Further, when children spend more time online, they are exposed to more advertisements for unhealthy products,[112] which are heavily targeted toward children.[113]  In addition, poor sleep quality —which, as discussed above, is associated with problematic internet use—increases the risk of childhood obesity by 20%.[114]

### v.  Harm to Privacy

120.    Design features that maximize children's time and activities online also exacerbate privacy harms. Like all users, children are tracked as they engage in online activities.[115] Data about

---

[107] Chloe Wilkinson et al., *Screen Time: The Effects on Children's Emotional, Social, and Cognitive Development* at 4 (2021), https://informedfutures.org/wp-content/uploads/Screen-time-The-effects-on-childrens-emotional-social-cognitive-development.pdf.

[108] *Heavy Social Media Use Linked to Poor Sleep*, BBC News (Oct. 23, 2019), https://www.bbc.com/news/health-50140111.

[109] *Among teens, sleep deprivation an epidemic*, Stanford News Ctr. (Oct. 8, 2015), https://med.stanford.edu/news/all-news/2015/10/among-teens-sleep-deprivation-an-epidemic.html.

[110] Jeff Chester et al., *Big Food, Big Tech, and the Global Childhood Obesity Pandemic* at 3 (2021), https://www.democraticmedia.org/sites/default/files/field/public-files/2021/full_report.pdf.

[111] E de Jong et al., *Association Between TV Viewing, Computer Use and Overweight, Determinants and Competing Activities of Screen Time in 4- to 13-Year-Old Children*, 37 Int'l J. Obesity 47, 52 (2013), https://pubmed.ncbi.nlm.nih.gov/22158265/.

[112] *Id.*

[113] Jeff Chester et al., *Big Food, Big Tech, and the Global Childhood Obesity Pandemic* at 3 (2021), available at https://www.democraticmedia.org/sites/default/files/field/public-files/2021/full_report.pdf.

[114] Yanhui Wu et al., *Short Sleep Duration and Obesity Among Children: A Systematic Review and Meta-Analysis of Prospective Studies*, 11 Obesity Rsch. & Clinical Prac. 140, 148 (2015), https://pubmed.ncbi.nlm.nih.gov/27269366/;
Michelle A. Miller et al., *Sleep Duration and Incidence of Obesity in Infants, Children, and Adolescents: A Systematic Review and Meta-Analysis of Prospective Studies*, 41 Sleep 1, 15 (2018), https://pubmed.ncbi.nlm.nih.gov/29401314/.

[115] *See, e.g.*, Reyes et al., *"Won't Somebody Think of the Children?" Examining COPPA Compliance at Scale*, 3 Proceedings on Privacy Enhancing Technologies 63, at 77 (2018), https://blues.cs.berkeley.edu/blog/2018/04/25/wont-somebody-think-of-the-children-examining-coppacompliance-at-scale/ (finding that out of 5,855 child-directed apps, roughly 57% were collecting personal information in potential violation of the Children's Online Privacy Protection Act).

phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 2218 (internal citations omitted).

124.    And, even more recently, the Northern District of California, in an order denying a motion to dismiss an intrusion upon seclusion claim for the exfiltration of children's personal data in different mobile apps, held that "current privacy expectations are developing, to say the least, with respect to a key issue raised in these cases – whether the data subject owns and controls his or her personal information, and whether a commercial entity that secretly harvests it commits a highly offensive or egregious act." *McDonald v. Kiloo ApS*, 385 F. Supp.3d 1022, 1035 (N.D. Cal. 2019). The *McDonald* court's reasoning was subsequently adopted in the District of New Mexico in analogous litigation. *See New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1127 (D.N.M. 2020), *on reconsideration*, No. 18-854 MV/JFR, 2021 WL 354003 (D.N.M. Feb. 2, 2021).

125.    It is precisely because of Instagram's and TikTok's capacity for "near perfect surveillance" that courts have consistently held that time-honored legal principles recognizing a right to privacy in one's affairs naturally apply to online monitoring.  Defendants' unlawful intrusion into their minor users' privacy is made even more egregious and offensive by the fact that the Defendants are targeting and collecting *children*'s information, without obtaining parental consent. The conduct described herein violates children's expectations of privacy, as well as a parent's inherent right to protect his or her child and set the parameters of what, when, and how information pertaining to the child will be obtained.  Parents' interest in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by society.  The history of Western civilization reflects a strong tradition of parental concern for the nurture and upbringing of children in light of children's vulnerable predispositions.  Our society recognizes that parents should maintain control over who interacts with their children and how, in order to ensure the safe and fair treatment of their children.

### vi.  Geopolitical Harms

126.    Finally, the above-identified harms are compounded by the fact that the TikTok Defendants are owned by ByteDance Ltd., which is a Chinese company, subject to Chinese law, including laws that mandate secret cooperation with China's intelligence apparatus, to the exclusion of any data protection guarantees existing in the United States.

what children do online is collected by a vast network that includes platforms, marketers, and third-party data brokers that use the information apps, websites, and services collect and retain about children to profile them, make predictions about their choices, and influence their behavior. Children do not developmentally understand digital privacy. The constant surveillance they are subjected to as a result of these techniques is manipulative, limits creativity and experimentation, and perpetuates discrimination, substantially harming children and teens.

121. Invasion of privacy has been recognized as a common law tort for over a century. *See Matera v. Google Inc.*, 15-CV-0402, 2016 WL 5339806, at *10 (N.D. Cal, Sept. 23, 2016) (citing Restatement (Second) of Torts §§ 652A-I for the proposition that "the right to privacy was first accepted by an American court in 1905, and 'a right to privacy is now recognized in the great majority of the American jurisdictions that have considered the question'"); *see also,* Restatement (Second) of Torts § 652B and defining an intrusion claim as follows: "One who intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

122. As Justice Brandeis explained in his seminal article, *The Right to Privacy,* "[t]he common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others." Samuel D. Warren & Louis Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 198 (1890). The Supreme Court similarly recognized the primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right to privacy older than the Bill of Rights." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).

123. More recently, the Supreme Court explicitly recognized the reasonable expectation of privacy an individual has in her cell phone, and the Personal Data generated therefrom, in its opinion in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). There, the Court held that continued access of an individual's cell phone location data constituted a search under the Fourth Amendment because "a cell phone—almost a "feature of human anatomy[]"—tracks nearly exactly the movements of its owner . . . A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales . . . Accordingly, when the Government tracks the location of a cell

127.    The sensitive, personally-identifiable data that TikTok collects from Louisiana children is accessible by individuals and entities subject to Chinese law and beholden to China's regime, including but not limited to laws requiring cooperation with China's national intelligence institutions and cybersecurity regulators. Chinese government officials have interpreted Chinese law as applying to any data in which China has a national intelligence or security interest, no matter where the data is located.

128.    Although TikTok states it is in the process of moving "protected" U.S. user data, which includes Louisiana children's data, to an Oracle cloud in the United States, it is not clear what data will be deemed "protected," and TikTok still currently and for some years has stored that data on other systems in the U.S. and Singapore. At least until October 2020, some U.S. data was stored on servers owned and operated by ByteDance Ltd., a company subject to Chinese law, and pursuant to a contract with Alibaba, a company also subject to Chinese law.

129.    Chinese law requires Chinese citizens, and individuals and entities in China to cooperate with national intelligence work undertaken by the Chinese government, and grants regulators broad authority to access private networks, communication systems, and facilities to conduct invasive inspections and reviews.

130.    These laws are broad, open-ended, and inscrutably applied. Moreover, there is no independent judiciary in China that operates outside the control of the Chinese Communist Party. Thus, there is no meaningful mechanism in China to resist these demands.

131.    Laws including, but not limited to, the National Security Law, Cybersecurity Law, and National Intelligence Law are part of "an interrelated package of national security, cyberspace, and law enforcement legislation" that "are aimed at strengthening the legal basis for China's security activities and requiring Chinese and foreign citizens, enterprises, and organizations to cooperate with them."[116]

---

[116] M. Scot Tanner, *Beijing's New National Intelligence Law: From Defense to Offense*, LAWFARE (July 20, 2017), https://bit.ly/3fXfB4A (referring to laws addressing "Counterespionage (2014), National Security (2015), Counterterrorism (2015), Cybersecurity (2016), and Foreign NGO Management (2016), as well as the Ninth Amendment to the PRC Criminal Law (2015), the Management Methods for Lawyers and Law Firms (both 2016), and the pending draft Encryption Law and draft Standardization Law"); *see also* M. Haldane, *What China's new data laws are and their impact on Big Tech*, SOUTH CHINA MORNING POST (Sept. 1, 2021), https://bit.ly/3zM0jX3 (describing later enacted Data Security Law and Personal Information Protection Law as being "built on the groundwork laid by the Cybersecurity Law"); W. Zheng, *Big data expert takes over as China's new cybersecurity chief*, SOUTH CHINA MORNING POST (Sept. 27, 2019), https://bit.ly/3t03fLR.

also cover all targets that need [cybersecurity] protection, including all networks, information systems, cloud platforms, the internet of things, control systems, big data and mobile internet."[123]

139.    These laws and regulations include, but are not limited to, China's Cybersecurity Law and Data Security Law.

140.    "China's Cybersecurity Law lays the foundation for a cybersecurity review of network products and services, also known as the Cybersecurity Review Regime."[124]

141.    The Cybersecurity Law applies broadly to, among others, "network operators," which can encompass not only "telecommunications or internet service providers (ISPs)" but also "anyone who uses [information communication and technology] systems."[125]

142.    Article 28 of China's Cybersecurity Law requires these "network operators" to cooperate with national intelligence activities, as well as criminal investigations. Specifically, Article 28 provides that, "Network operators shall provide technical support and assistance to public security organs and national security organs that are safeguarding national security and investigating criminal activities in accordance with the law."[126]

143.    Article 49 further provides that "network operators shall cooperate with cybersecurity and informatization departments and relevant departments in conducting implementation of supervision and inspections in accordance with the law."[127]

144.    The Cybersecurity Law applies even more stringent requirements and oversight on organizations deemed "critical information infrastructure operators."

145.    For example, Article 35 provides that "[c]ritical information infrastructure operators purchasing network products and services that might impact national security shall undergo a national security review organized by the State cybersecurity and informatization departments and relevant departments of the State Council."[128]

146.    Article 37 further provides that:

> [c]ritical information infrastructure operators that gather or produce personal information or important data during operations within the mainland territory of the People's Republic of China, shall store it

---

[123] W. Zheng, *Big data expert takes over as China's new cybersecurity chief*, SOUTH CHINA MORNING POST (Sept. 27, 2019), https://bit.ly/3t03fLR.
[124] CSIS Briefs, *How Chinese Cybersecurity Standards Impact Doing Business in China*, CENTER FOR STRATEGIC AND INTERNATIONAL STUDIES (Aug. 2, 2018), https://bit.ly/3DupnTq.
[125] *Id.*
[126] CYBERSECURITY LAW OF THE PEOPLE'S REPUBLIC OF CHINA, art. 28, Stanford (2017) ("CYBERSECURITY LAW"), https://stanford.io/3T5wes8.
[127] CYBERSECURITY LAW, art. 49.
[128] CYBERSECURITY LAW, art. 35.

132. China's National Security Law places "the responsibility and duty to safeguard national security" on all "*[c]itizens of the People's Republic of China*, all State bodies and armed forces, all political parties and people's organizations, *enterprises*, undertakings, organizations and all other social organizations."[117]

133. The National Intelligence Law expounds on this responsibility, requiring all organizations and Chinese citizens to "cooperate with national intelligence efforts," and permits national intelligence institutions to collect information, question organizations and individuals, and take control of facilities and "communication[ ] tools."[118]

134. Specifically, the National Intelligence Law provides that "[a]ll organizations and citizens shall support, assist, and cooperate with national intelligence efforts in accordance with law, and shall protect national intelligence work secrets they are aware of."[119]

135. Article 14 provides that "[n]ational intelligence work institutions lawfully carrying out intelligence efforts may request that relevant organs, organizations, and citizens provide necessary support, assistance, and cooperation."[120]

136. Article 16 provides that these institutions "may enter relevant restricted areas and venues; may learn from and question relevant institutions, organizations, and individuals; and may read or collect relevant files, materials or items."[121]

137. Article 17 provides that "[a]s necessary for their work, the staff of national intelligence work institutions may, in accordance with relevant national provisions, have priority use of, or lawfully requisition, state organs', organizations' or individuals' transportation or communications tools, premises and buildings . . . ."[122]

138. Against this backdrop are numerous laws and regulations designed to form a comprehensive cybersecurity regime. The "chief engineer at the [Ministry of Public Security's] Cybersecurity Bureau," Guo Qiquan, described the scheme as intended to "cover every district, every ministry, every business and other institution, basically covering the whole society. It will

---

[117] NATIONAL SECURITY LAW OF THE PEOPLE'S REPUBLIC OF CHINA, art. 11, STANFORD (2015), https://stanford.io/3sScPjX (emphasis added).
[118] NATIONAL INTELLIGENCE LAW OF THE PEOPLE'S REPUBLIC OF CHINA, arts. 7, 17, STANFORD (2017) ("NAT'L INTELLIGENCE LAW"), https://stanford.io/3sScPjX.
[119] NAT'L INTELLIGENCE LAW, art. 7.
[120] NAT'L INTELLIGENCE LAW, art. 14.
[121] NAT'L INTELLIGENCE LAW, art. 16.
[122] NAT'L INTELLIGENCE LAW, art. 17.

within mainland China. Where due to business requirements it is truly necessary to provide it outside the mainland, they shall follow the measures jointly formulated by the State cybersecurity and informatization departments and the relevant departments of the State Council to conduct a security assessment; where laws and administrative regulations provide otherwise, follow those provisions.[129]

147.    Since the law's enactment, authorities have issued regulations expanding its scope.[130]

148.    Exactly what type of organization may be designated a "critical information infrastructure operator" is not always clear. However, authorities' use of the applicable procedures indicates that tech companies and platforms could be subject to an invasive cybersecurity review, and that authorities' power to require a company to take any action pursuant to a cybersecurity review—even if justified only after the fact—could have significant consequences for its business.[131]

149.    For example, in July 2021, just a few days after the Chinese ride-hailing service Didi raised billions of dollars in a New York IPO, the Cyberspace Administration of China (CAC), a "merged party-state institution listed under the Central Committee of the Chinese Communist Party,"[132] initiated a cybersecurity review of Didi. The CAC further "suspended new user registrations during the review" and ordered the removal of the company's applications from app stores in China.[133] Although the law and related regulations did not explicitly apply to Didi in advance of the review, CAC published a list of proposed new rules applying the cybersecurity review requirements to Didi *after* it began its review.[134]    CAC eventually imposed a $1.2 billion fine on the company.[135]

---

[129] CYBERSECURITY LAW, art. 37.
[130] B. Guo and B. Li, *China Issued New Measures for Cybersecurity Review in 2022*, WHITE & CASE (Feb. 8, 2022), https://bit.ly/3E2fRs8; J. Gong and C. Yue, *China Updated its Cybersecurity Review Regime*, BIRD & BIRD (Jan. 13, 2022), https://bit.ly/3fyWRrI.

[131] A. Huld, *Critical Information Infrastructure in China – New Cybersecurity Regulations*, THE CHINA BRIEFING (Aug. 30, 2021), https://bit.ly/3T8SOiH; *supra*, B. Guo and B. Li, *China Issued New Measures for Cybersecurity Review in 2022*, https://bit.ly/3E2fRs8; *supra*, J. Gong and C. Yue, *China Updated its Cybersecurity Review Regime*, https://bit.ly/3fyWRrI; M. Shi, et al., *Forum: Unpacking the DiDi Decision*, DIGICHINA, STANFORD (July 22, 2022), https://stanford.io/3T4ZAqM.
[132] J. Horsley, *Behind the Façade of China's Cyber Super-Regulator*, DIGICHINA, STANFORD (Aug. 8, 2022), https://stanford.io/3FPAOYy.
[133] *Id.*; *supra*, B. Guo and B. Li, *China Issued New Measures for Cybersecurity Review in 2022*, https://bit.ly/3E2fRs8.
[134] J. Horsley, *Behind the Façade of China's Cyber Super-Regulator*, DIGICHINA, STANFORD (Aug. 8, 2022), https://stanford.io/3FPAOYy.
[135] *Id.*

150. The Data Security Law applies in China as well as to "data handling activities outside the mainland territory of the PRC [that] harm the national security, the public interest, or the lawful rights and interests of citizens or organizations of the PRC.[136]

151. Article 24 provides that "[t]he State is to establish a data security review system and conduct national security reviews for data handling activities that affect or may affect national security."[137]

152. Further, Article 31 applies "[t]he provisions of the Cybersecurity Law . . . to the outbound security management of important data collected or produced by critical information infrastructure operators operating within the mainland territory of the PRC."[138]

153. Under the Data Security law, even "a company holding data belonging to a US citizen stored on a Chinese server may not be able to legally hand over that data to the US government without proper approval."[139] More specifically, under Article 35, whether operating critical information infrastructure or not, companies "are prohibited from providing any data *stored* in China, regardless of the data's sensitivity level and whether or not the data was initially *collected* in China, to any foreign judicial or law enforcement agency without the prior approval of the relevant [Chinese Government] authorities."[140]

154. Experts across a variety of fields, including law, national security, and technology agree that Chinese laws require any individuals or entities in China or otherwise subject to Chinese law to cooperate with the Chinese government, including China's intelligence and security services, and that there is no meaningful way to resist these requirements, or any pressure brought to bear by the Party.[141] TikTok and ByteDance leadership and employees who are Chinese citizens

---

[136] DATA SECURITY LAW OF THE PEOPLE'S REPUBLIC OF CHINA, art. 2, DIGICHINA STANFORD (2021) ("DATA SECURITY LAW"), https://stanford.io/3U5iijm.

[137] DATA SECURITY LAW, art. 24.
[138] DATA SECURITY LAW, art. 31.
[139] M. Haldane, *What China's new data laws are and their impact on Big Tech*, SOUTH CHINA MORNING POST (Sept. 1, 2021), https://bit.ly/3zM0jX3.
[140] R. Junck et. al, *China's New Data Security and Personal Information Protection Laws: What they Mean for Multinational Companies*, SKADDEN, ARPS, SLATE, MEAGHER & FLOM (Nov. 3, 2021), https://bit.ly/3NBc20c (emphasis added); DATA SECURITY LAW, art. 35.
[141] *See, e.g.*, K. Kitchen, *The Chinese Threat to Privacy*, AM. FOREIGN POLICY COUNCIL, Issue 30, at 23 (May 2021), https://bit.ly/3A0bDyX; W. Knight, *TikTok a Year After Trump's Ban: No Change, but New Threats*, WIRED (July 26, 2021), https://bit.ly/3FWu2QW, (quoting K. Frederick, Director of the Tech Policy Center at the Heritage Foundation); K. Frederick, et al, *Beyond TikTok: Preparing for Future Digital Threats*, WAR ON THE ROCKS (Aug. 20, 2020), https://bit.ly/3WFF3fg; J. Barnes, *White House Official Says Huawei Has Secret Back Door to Extract Data*, N.Y. TIMES (Feb. 11, 2020), https://nytims/3udZHpH (quoting former National Security Advisor Robert O'Brien); A. Kharpal, *Huawei says it would never hand data to China's*

or who are located in China are no exception; they are subject to the Chinese regime, including to these laws and requirements.

155.    Further, Chinese law enforcement and intelligence services interpret Chinese law as applying to any data, wherever it is stored, if China has a national security interest in that data. Chinese authorities have forced even refugees from China to hand over data stored outside of China to Chinese authorities under such circumstances, citing Chinese law.

156.    In sum, any data stored *or accessed* by individuals or entities subject to Chinese laws, as written and as interpreted and applied by Chinese government officials, is not safe from access by the Chinese government, for any use it deems fit.

157.    The geopolitical reality of a dominant social media platform being controlled by an authoritarian regime drastically amplifies the harms—and the stakes—associated with children's addiction to TikTok in the U.S.

158.    The federal government is cognizant of these risks and has begun acting upon them: the chief administrative officer of the House recently ordered lawmakers and staffers to delete TikTok from any House-issued mobile phones and prohibited them from downloading it on such devices, while a bill introduced in the Senate would ban the platform completely within the US.[142]

159.    After the November midterm elections, FBI Director Christopher Wray warned lawmakers that the Chinese government could use TikTok to control users' devices for influence or espionage purposes.[143] And most recently, Senators Dick Blumenthal and Jerry Moran wrote to Treasury Secretary Janet Yellen, "urg[ing] the Committee on Foreign Investment in the United

---

*government. Experts say it wouldn't have a choice*, CNBC (Mar. 4,2019), https://cnb.cx/3Gmno6T (quoting NYU Professor of Law Emeritus and Director of the U.S.-Asia Law Institute J. Cohen and M. Thorley, postdoctoral research fellow at the University of Exeter with experience building a business in China); F. Ryan, et al., *TikTok and WeChat: Curating and controlling global information flows*, AUSTRALIAN STRATEGIC POL'Y INST., 36 (Sept. 1, 2020), https://bit.ly/3hm26vq; D. Harwell and T. Romm, *Inside TikTok: A culture clash where U.S. views about censorship often were overridden by the Chinese bosses*, WASH. POST (Nov. 5, 2019), https://wapo.st/3WPMX5S (quoting Alex Stamos, Director of the Stanford Internet Observatory).
[142] Rebecca Shabad, *Sen. Josh Hawley says he'll introduce legislation to ban TikTok nationwide*, NBC News (Jan. 25, 2023) (available at https://www.nbcnews.com/politics/congress/sen-josh-hawley-says-introduce-legislation-ban-tiktok-nationwide-rcna67479)
[143] *Id.*

States (CFIUS)[144] to…impose strict structural restrictions between TikTok's American operations and its Chinese parent company, ByteDance, including potentially separating the companies."[145]

160.    The letter went on to state that

> TikTok and ByteDance cannot be trusted by CFIUS or its tens of millions of users in the United States. In response to these and other credible media reports, Congressional scrutiny, and investigative research about the threat of Chinese spying and malign influence, TikTok has pursued a campaign of diversion and deflection to distract from these serious risks. TikTok is clearly, inextricably dependent on ByteDance for its operations, and therefore beholden to the government of China. We share the concerns of FBI Director Christopher Wray that China could use the app to collect data on tens millions of American users and attempt to influence our public discourse.
>
> …
>
> ByteDance's engineers continue to have dangerous access to Americans' personal data and control over its algorithmic recommendation systems, access that continues enable this spying on journalists. TikTok has failed to implement adequate protections in the four years since it acquired the app, despite continued assurances to the contrary.[146]

161.    Lawmakers' concerns are not just about national security.  The addictiveness of the platform is equally concerned.  "TikTok is digital fentanyl," said Rep. Mike Gallagher, R-Wis., the chairman of the new House select committee on China.[147]

### vii.  Risk to Physical Safety

162.    Finally, Defendants' platforms provide fertile ground for child predators.  TikTok "has emerged as the biggest, fastest-growing danger zone yet, according to law-enforcement officials and others who track child exploitation."[148]

---

[144] The Committee on Foreign Investment in the United States is an interagency task force responsible for reviewing foreign investments and transactions that could pose a risk to our national security. CFIUS has the power to block, or order the divestment of, foreign acquisitions of American companies or technologies, including on the basis of protecting the sensitive personal data of consumers. The Committee has jurisdiction over TikTok's U.S. operations, and has acknowledged an active investigation, on the basis that the app was created from ByteDance's acquisition of American social media company Musical.ly in 2017.

[145] Letter from Senators Richard Blumenthal and Jerry Moran to Secretary of the Treasury Janet Yellen (Feb. 16, 2023) (available at https://www.blumenthal.senate.gov/imo/media/doc/20230216cfiustiktok.pdf)

[146] Id.

[147] Scott Wong, Kate Santaliz and Liz Brown-Kaiser, *Momentum builds in Congress to crack down on TikTok*, NBC News (Feb. 18, 2023) (available at https://www.nbcnews.com/politics/congress/congress-tiktok-ban-social-media-harms-teens-rcna70998)

[148] Tawnell D. Hobbs, *'Every Parent's Nightmare': TikTok Is a Venue for Child Sexual Exploitation*, Wall Street Journal (Feb. 15, 2023) (available at https://www.wsj.com/articles/tiktok-child-sexual-exploitation-children-teens-29f9ac2?mod=hp_lead_pos5)

163.    TikTok's algorithm is designed to learn what type of content users like, then feed them a string of it. That keeps children glued to the site and makes it easier for pedophiles to seek them out. A user who lingers on videos of, say, teens dancing gets sent more videos of the very same thing.[149]

164.    "The audience that's following these children, a lot of them are adult males that have a sexual interest in children," said Jon Rouse, a 38-year police veteran who leads a group targeting child sex offenders for Interpol, an international police network. "Child sex offenders will gravitate toward where there are children. Pedophiles prefer looking at videos."[150]

165.    With so many videos pouring onto the platform, child-exploitation experts question whether TikTok can effectively monitor them for inappropriate behavior. TikTok's competitors—including Instagram—are attempting to replicate its success by copying the short-video format, adding to the torrent of content and concerns.  This, in turn, spreads the risk of drawing child predators to these other platforms, including Instagram.[151]

166.    Erin Burke, a division chief at the main investigations arm of the Department of Homeland Security and past leader of its child-exploitation unit, is among those who cite TikTok as a platform frequently used by predators to meet children.[152] "It is a perfect place for predators to meet, groom and engage children," said Burke, calling it the "platform of choice" for the behavior.[153]

167.    Similarly, in November 2019, the National Center on Sexual Exploitation partnered with DC-based, survivor-led service organization Courtney's House, Australia's Collective Shout, and Canada's Defend Dignity to launch #WakeUpInstagram, a campaign calling out Instagram for facilitating child sexual abuse, sex trafficking, and the grooming of young children on its platform.[154]

168.    In May 2021, the child protection non-profit Thorn published quantitative research, based on data collected in 2020.[155] According to this report, Instagram ranked at the top among

---

[149] *Id.*
[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] Christina Criddle, *TikTok under US government investigation over child sexual abuse material*, Ars Technica, (Apr. 15, 2022) (available at https://arstechnica.com/tech-policy/2022/04/tiktok-under-us-government-investigation-on-child-sexual-abuse-material/)
[154] https://endsexualexploitation.org/instagram/
[155] Thorn, *Responding to Online Threats: Minors' Perspectives on Disclosing, Reporting, and Blocking Findings from 2020 quantitative research among 9–17 year olds*, (May 2021)

platforms for various harms caused to minors. Thorn found the following regarding harm on Instagram:

- 26% of surveyed minors reported having had a potentially harmful online experience through Instagram (tied with Snapchat for the highest percentage).

- Instagram tied with Snapchat again as most popular platforms where the most survey participants said they have had an online sexual interaction (16% of all respondents). Sexually explicit interaction could include being asked to send a nude photo or video, go 'on cam' with a sexually explicit stream, being sent a sexually explicit photo (of themselves or another child), or sexually explicit messages, etc.

- Of those who use Instagram at least once a day, 22% reported experiencing a sexually explicit interaction on the platform (second only to Snapchat at 23%).

- Most disturbing, Thorn notes that among the most used platforms, Instagram (together with Snapchat) appears to host the highest concentration of sexually explicit interactions between minors and adults (13% of users).

- Teenage girls, who are particularly vulnerable to online sexual interactions, have the majority of these experiences on Instagram (21%) and Snapchat (21%) —mirroring the experience of minors overall.

169.    Defendants' platforms are uniquely positioned to place children in contact with predators, without the knowledge of their parents, and to date, they have operated with flagrant disregard for the safety of their child users.

### E. THE SURGEON GENERAL ISSUED AN ADVISORY ABOUT THE NEGATIVE IMPACTS OF SOCIAL MEDIA USAGE ON MINORS' MENTAL HEALTH

170.    On May 23, 2023, the United States Surgeon General Dr. Vivek Murthy released the document *Surgeon General's Advisory on Social Media and Youth Mental Health*[156] ("Social Media Advisory"). Critically, the Social Media Health Advisory expressed concerns about the above-mentioned design elements, and their negative impact on children's mental health, explaining that

---

(available at
https://info.thorn.org/hubfs/Research/Responding%20to%20Online%20Threats_2021-Full-Report.pdf?utm_campaign=H2D%20report&utm_source=website)

[156] Available at https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf

[e]xcessive and problematic use of social media can harm children and adolescents by disrupting important healthy behaviors. Social media platforms are often designed to maximize user engagement, which has the potential to encourage excessive use and behavioral dysregulation. Push notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data to serve content recommendations are some examples of these features that maximize engagement. According to one recent model, nearly a third (31%) of social media use may be attributable to self-control challenges magnified by habit formation. Further, some researchers believe that social media exposure can overstimulate the reward center in the brain and, when stimulation becomes excessive, can trigger pathways comparable to addiction. Small studies have shown that people with frequent and problematic social media use can experience changes in brain structure similar to changes seen in individuals with substance use or gambling addictions.[157]

171.    The document further addressed the urgency of the problem:

Our children and adolescents don't have the luxury of waiting years until we know the full extent of social media's impact. Their childhoods and development are happening now. While social media use can have positive impacts for some children, the evidence noted throughout this Surgeon General's Advisory necessitates significant concern with the way it is currently designed, deployed, and utilized. Child and adolescent use of platforms designed for adults places them at high risk of "unsupervised, developmentally inappropriate, and potentially harmful" use according to the National Scientific Council on Adolescence. At a moment when we are experiencing a national youth mental health crisis, now is the time to act swiftly and decisively to protect children and adolescents from risk of harm.

172.    In support of the Surgeon General's Social Media Advisory, leaders at six of the

nation's medical organizations expressed their concern on social media's effects on youth mental

health:[158]

*"Social media can be a powerful tool for connection, but it can also lead to increased feelings of depression and anxiety – particularly among adolescents. Family physicians are often the first stop for parents and families concerned about the physical and emotional health of young people in their lives, and we confront the mental health crisis among youth every day. The American Academy of Family Physicians commends the Surgeon General for identifying this risk for America's youth and joins our colleagues across the health care community in equipping young people and their families with the resources necessary to live healthy, balanced lives."* -- **Tochi Iroku-Malize, M.D., MPH, MBA, FAAFP, President, American Academy of Family Physicians**

---

[157] Social Media Advisory at 9 (end-note citations omitted).
[158] *See, generally,* U.S. Department of Health and Human Services Website, *Surgeon General Issues New Advisory About Effects Social Media Use Has on Youth Mental Health* (May 23, 2023) (available at https://www.hhs.gov/about/news/2023/05/23/surgeon-general-issues-new-advisory-about-effects-social-media-use-has-youth-mental-health.html)

*"Today's children and teens do not know a world without digital technology, but the digital world wasn't built with children's healthy mental development in mind. We need an approach to help children both on and offline that meets each child where they are while also working to make the digital spaces they inhabit safer and healthier. The Surgeon General's Advisory calls for just that approach. The American Academy of Pediatrics looks forward to working with the Surgeon General and other federal leaders on Youth Mental Health and Social Media on this important work."* – **Sandy Chung, M.D., FAAP, President, American Academy of Pediatrics**

*"With near universal social media use by America's young people, these apps and sites introduce profound risk and mental health harms in ways we are only now beginning to fully understand. As physicians, we see firsthand the impact of social media, particularly during adolescence – a critical period of brain development. As we grapple with the growing, but still insufficient, research and evidence in this area, we applaud the Surgeon General for issuing this important Advisory to highlight this issue and enumerate concrete steps stakeholders can take to address concerns and protect the mental health and wellbeing of children and adolescents. We continue to believe in the positive benefits of social media, but we also urge safeguards and additional study of the positive and negative biological, psychological, and social effects of social media."* – **Jack Resneck Jr., M.D., President, American Medical Association**

*"The first principle of health care is to do no harm – that's the same standard we need to start holding social media platforms to. As the Surgeon General has pointed out throughout his tenure, we all have a role to play in addressing the youth mental health crisis that we now face as a nation. We have the responsibility to ensure social media keeps young people safe. And as this Surgeon General's Advisory makes clear, we as physicians and healers have a responsibility to be part of the effort to do so."* – **Saul Levin, M.D., M.P.A., CEO and Medical Director, American Psychiatric Association**

*"The American Psychological Association applauds the Surgeon General's Advisory on Social Media and Youth Mental Health, affirming the use of psychological science to reach clear-eyed recommendations that will help keep our youth safe online. Psychological research shows that young people mature at different rates, with some more vulnerable than others to the content and features on many social media platforms. We support the advisory's recommendations and pledge to work with the Surgeon General's Office to help build the healthy digital environment that our kids need and deserve."* – **Arthur Evans, Jr., Ph.D., Chief Executive Officer and Executive Vice President, American Psychological Association.**

*"Social media use by young people is pervasive. It can help them, and all of us, live more connected lives – if, and only if, the appropriate oversight, regulation and guardrails are applied. Now is the moment for policymakers, companies and experts to come together and ensure social media is set up safety-first, to help young users grow and thrive. The Surgeon General's Advisory about the effects of social media on youth mental health issued today lays out a roadmap for us to do so, and it's critical that we undertake this collective effort with care and urgency to help today's youth."* – **Susan L. Polan, Ph.D., Associate Executive Director, Public Affairs and Advocacy, American Public Health Association.**

173.    Similarly, the National Parent Teacher Association issued the following statement:

> *"Every parent's top priority for their child is for them to be happy, healthy and safe. We have heard from families who say they need and want information about using social media and devices. This Advisory from the Surgeon General confirms that family engagement on this topic is vital and continues to be one of the core solutions to keeping children safe online and supporting their mental health and well-being."* – **Anna King, President of the National Parent Teacher Association.**

### F.  INSTAGRAM AND TIKTOK DECEPTIVELY REPRESENT THAT THEIR PLATFORMS ARE SAFE FOR MINOR USERS

174.    Instagram and TikTok hold their platforms out to be safe and suitable for minor users, notwithstanding the above-described dangers that are inherent—indeed, intentionally embedded—in the services.

175.    For example, Instagram's Terms of Service[159] represent, *inter alia*, a commitment to "[f]ostering a positive, inclusive, and safe environment," stating "[w]e develop and use tools and offer resources to our community members that help to make their experiences positive and inclusive…We also have teams and systems that work to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior." Instagram further represents that it is intended for minors ages 13 and above.

176.    Similarly, TikTok's Community Guidelines[160], which are incorporated into its Terms of Service[161] warrant, *inter alia*, "a safe, trustworthy, and vibrant experience," and state that their guidelines are "informed by international legal frameworks, industry best practices, and input from our community, safety and public health experts, and our regional Advisory Councils. We evolve them to address emerging risks and potential harms that may occur from new behaviors." These Guidelines further warrant that content will be "age-restrict[ed]" for users under age 18. Specifically, TikTok's "Youth Safety and Well-Being"[162] statement warrants "a more limited experience designed with additional safety protections" for users under age 13, and additional protections for users from 13-18 (*id.*). Per TikTok, "[o]ur goal is to provide young people with an experience that is developmentally appropriate and helps to ensure a safe space for self-exploration." *Id.*

---

[159] Available at https://help.instagram.com/581066165581870
[160] Available at https://www.tiktok.com/community-guidelines/en/
[161] Available at https://www.tiktok.com/legal/page/us/terms-of-service/en
[162] Available at https://www.tiktok.com/community-guidelines/en/youth-safety/?cgversion=2023

177.    Notwithstanding the above-described representations, both Instagram and TikTok have intentionally incorporated design elements into their platforms that are harmful to minors, and which directly contravene the above representations.

### G. THE ISP DEFENDANTS' ROLE IN CHILDREN'S HARMFUL USE OF SOCIAL MEDIA

178.    While the Instagram and TikTok Defendants have created harmful social media platforms, those platforms could not be accessed by children without the ISP Defendants. It is their business—and their attendant physical infrastructure in the State of Louisiana and in Livingston Parish, specifically—that enables children to access these platforms in the first place.

179.    But this does not need to be the case. In 2018, the FCC specifically repealed prior regulations—styled as "net neutrality"—that had prohibited ISPs from blocking or throttling specific websites or web-based services. Before that time—for at least several years—net neutrality prohibited ISPs from privileging one website or web service over another, or from blocking access to a given website, wholesale. However, following outcry from ISPs—including the ISP Defendants—the FCC reversed its policy and removed this regulation.[163]

180.    In point of fact, the ISP Defendants *suggest* that children have access to social media services blocked, under certain circumstances.

181.    For example, on a support page titled "Keeping Children Safe Online," ISP Defendant Charter urges parents to "Consider using parental control software to limit the websites your child can access....For older children, set boundaries for social media websites (Facebook, Instagram, Twitter, etc.) and social apps like Snapchat. You can configure privacy settings to block messages from strangers, and approve your children's list of friends or followers. Web-filtering software can even be installed to block unauthorized chat rooms."[164]

182.    Similarly, ISP Defendant Cox has a host of suggestions for parents regarding problematic Internet use, including a dedicated page discussing the dangers of Instagram,[165] which specifically acknowledges risks associated with the platform:

> **What are some other risks associated with kids using Instagram?**

---

[163] *In the Matter of Restoring Internet Freedom*, WC Docket No. 17-108 (available at https://www.fcc.gov/fcc-releases-restoring-internet-freedom-order#:~:text=On%20January%205%2C%202017%2C%20the,mobile%20broadband%20Internet%20access%20service.)

[164] *Keeping Children Safe Online* (available at https://www.spectrum.net/support/internet/keeping-children-safe-online)

[165] Paretns' Ultimate Guide to Instagram (Mar. 6, 2023) (available at https://www.cox.com/residential/articles/parents-ultimate-guide-to-instagram.html)

Livingston Parish Public Schools, there were 2,306 disciplinary incidents involving cell phones and the unauthorized use of technology for the school year 2021-2022. There were 2,488 disciplinary incidents involving cell phones and unauthorized use of technology for the school year 2022–2023. These incidents continue, unabated.

186.    Each of these disciplinary incidents took—and will continue to take—time away from the Plaintiff's primary mission to educate the children of Livingston Parish. A survey conducted by the Plaintiff entitled "Social Media Guidance Counselors Time" estimated that a range of 5% to more than 50% of Livingston guidance counselor time was spent addressing social media issues.

187.    The indices of the youth mental health crisis directly and detrimentally impact Plaintiff, which consistently diverts resources from its core educational mission to address disciplinary and mental health issues caused by Defendants. A collective average of 29.7% of time spent addressing social media and technology issues translating to an exorbitant annual cost of $939,104.64 to the Plaintiff.

188.    This is only a measure of one segment of damages suffered by Plaintiff, and additional injuries—both tangible and intangible—have been and continue to be suffered as a result of Defendants' conduct.

## V.    CAUSES OF ACTION

### COUNT ONE
### (AS TO THE INSTAGRAM AND TIKTOK DEFENDANTS)
### FAULT, LA. C.C. ART. 2315

189.    Plaintiff incorporates each preceding paragraph as though set forth fully herein.

190.    Plaintiff brings this claim pursuant to the Tort Laws of the State of Louisiana which allow for relief for the intentional and negligent conduct complained of herein.

191.    The intentional conduct of the Defendants as hereinabove alleged is injurious to health or indecent or offensive to the senses, or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property.

192.    Intentional conduct that substantially and/or unreasonably interferes with the Plaintiff's use of its property is proscribed by Louisiana Civil Code Article 2315.

193.    Defendants have created a mental health crisis in Plaintiff's Public School System, (hereinafter "Public Schools") injuring the public health and safety of Plaintiff's community and interfering with the operations, use, and enjoyment of its Public Schools.

194.    Employees and patrons, including students have a right to be free from conduct that endangers their health and safety. Yet Defendants have engaged in conduct which endangers or injures the health and safety of the employees and students of the Public Schools by designing, marketing, and operating their respective social media platforms for use by students in a manner that substantially interferes with the functions and operations of the Public Schools and impacts the public health, safety, and welfare of the Parish.

195.    Each Defendant has created or assisted in the creation of a condition that is injurious to the health and safety of Plaintiff and its students and employees and interferes with the comfortable enjoyment of life and property of the Public Schools community.

196.    The health and safety of the students and employees of Public Schools, including those who use, have used, or will use Defendants' platforms, as well as those affected by others' use of their platforms, are matters of substantial public interest and of legitimate concern to Plaintiff.

197.    Defendants' intentional and negligent conduct has affected and continues to affect a substantial number of people within the Public Schools community and is likely to continue causing significant harm.

198.    Defendants' intentional and negligent conduct has directly caused a severe disruption of the public health, order, and safety. Defendants' conduct is ongoing and continues to produce permanent and long- lasting damage.

199.    This harm to youth mental health and the corresponding impacts to public health, safety, and the welfare of the Public Schools community outweighs any social utility of Defendants' wrongful conduct.

200.    The rights, interests, and inconvenience to the Public Schools' community far outweigh the rights, interests, and inconvenience to Defendants, who have profited tremendously from their wrongful conduct.

201.    But for Defendants' actions, Plaintiff's students would not use social media platforms as frequently, persistently, or for such lengthy duration as they do today, be deluged

Because Instagram is so image-based, kids who focus on external validation can get preoccupied with perfection, image, and status, which can negatively affect their well-being. Internal research from Meta leaked in 2021 showed that using Instagram makes body-image issues worse for young people, especially teenage girls. Other mental health issues like anxiety, depression, and low self-esteem have also been linked to the app.

It's not uncommon for some users to curate their feed by uploading only photos and videos that show them at their best and by deleting posts that don't get a certain number of likes. To keep up, teens may post sexy pictures or reveal too much personal information. The effects of influencers are real, so knowing who your kid follows and why might give you insight into who they admire and what products that person might be pushing (note that there's a way to buy products right from the app). As with any other social media app that includes likes and follows, some teens use those as a measuring stick and compare themselves to others. If your kid's activity on the app takes a turn from connection and fun to perfection and anxiety, it's time to take a break. Using it to scroll through other people's posts for long stretches every day can make teens feel worse than when they opened the app.[166]

183.    Among the suggested options for concerned parents, Cox recommends using blocking software to prohibit the use of the platform,[167] and on another page titled *Kids May be Device Wizards, but Need to be Safe*, Cox instructs parents to "consider blocking a social media site or deleting an email account if you're truly worried." [168]

184.    Thus, the ISP Defendants are aware of the problems inherent in social media use among children, and even advocate for blocking children's access to these platforms. The ISP Defendants can apply a host of different techniques, from firewalls, to DNS filters, to deep packet inspection ("DPI"), among others, to prohibit students in Plaintiff's schools from accessing harmful social media platforms, on school property and during school hours.

## H. PLAINTIFF HAS SUFFERED DAMAGES AS A RESULT OF DEFENDANTS' CONDUCT

185.    The persistent and continuous national harm crested by the social media monoliths and their campaign to addict children and teenagers is felt at the school board level. The manifestations and magnitude of the injuries—both foreseeable and indeed foreseen by Defendants—directly harms the schools tasked with educating these minors. For example, in the

---

[166] *Id.*
[167] *Id.*
[168] Available at https://www.cox.com/residential/articles/kids-device-wizards-safe.html

with exploitive and harmful content to the same degree, and the public health crisis that currently exists as a result of Defendants' conduct would have been averted.

202.    Logic, common sense, justice, policy, and precedent indicate Defendants' unfair and deceptive conduct has caused the damage and harm complained of herein. Defendants knew and intended that their design, promotion, and operation of their platforms would cause students to use their platforms excessively, that their marketing methods were designed to appeal to youth, and that their active efforts to increase youth use of their platforms were causing harm to youth and to schools, including youth under Plaintiff's care and custody.

203.    Thus, the fault of the Defendants and the harm and injury thereby caused was reasonably foreseeable, including the financial and economic losses incurred by Public Schools.

204.    Alternatively, Defendants' conduct was a substantial factor in bringing about the harm and injury described above even if a similar result would have occurred without it. By designing, marketing, promoting, and operating their platforms in a manner intended to maximize the time youth spend on their respective platforms—despite knowledge of the harms to youth from their wrongful conduct—Defendants directly facilitated the widespread, excessive, and habitual use of their platforms and the public nuisance affecting Public Schools. By seeking to capitalize on their success by refining their platforms to increase the time youth spend on their platforms, Defendants directly contributed to the public health crisis affecting the Public Schools.

205.    Defendants' conduct is especially injurious to Public Schools because, as a direct and proximate cause of Defendants' conduct creating or assisting in the creation of a public nuisance, Plaintiff and its students and employees have sustained and will continue to sustain substantial injuries.

206.    Plaintiff has had to take steps to mitigate the harm and disruption caused by Defendants' conduct, including the following:

    a.  hiring additional personnel to address mental, emotional, and social health issues;

    b.  developing additional resources to address mental, emotional, and social health issues;

    c.  increasing training for teachers and staff to identify students exhibiting symptoms affecting their mental, emotional, and social health;

    d.  training teachers, staff, and members of the community about the harms caused by Defendants' wrongful conduct;

e.  developing lesson plans to teach students about the dangers of using Defendants' platforms;

f.  educating students about the dangers of using Defendants' platforms;

g.  addressing property damaged as a result of students acting out because of mental, social, and emotional problems Defendants' conduct is causing;

h.  increasing disciplinary services and time spent addressing bullying, harassment, and threats;

i.  confiscating devices on which students use Defendants' platforms while in class or on Plaintiff's school campuses;

j.  meeting with students and the parents of students caught using Defendants' platforms at school or other disciplinary matters related to students' use of Defendants' platforms;

k.  diverting time and resources from instruction activities to notify parents and guardians of students' behavioral issues and attendance;

l.  investigating and responding to threats made against Plaintiff's schools and students over social media;

m.  updating its student handbook to address use of Defendants' platforms; and

n.  updating school policies to address use of Defendants' platforms.

207.  Fully abating the nuisance resulting from Defendants' conduct will require much more than these steps.

208.  Plaintiff requests an order providing for abatement of the public harm and injury that Defendants have created or assisted in the creation of, and enjoining Defendants from such conduct in the future.

209.  Plaintiff also seeks the maximum damages permitted by law, including actual and compensatory damages, as a result of the fault and conduct of Defendants.

**COUNT TWO**
**(AS TO THE INSTAGRAM AND TIKTOK DEFENDANTS)**
**VIOLATION OF LOUISIANA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, LA. REV. STAT. ANN. §§ 51:1401, *ET SEQ*.**

210.  Plaintiff incorporates each preceding paragraph as though set forth fully herein.

211.    Plaintiff brings this claim pursuant to Louisiana's Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*, which allows for relief for conduct complained of here.

212.    Plaintiff and Defendants are "Persons" as defined under La. Rev. Stat. Ann. § 51:1402(8).

213.    Defendants' conduct complained of herein amounts to unlawful unfair or deceptive acts or practices in the conduct of any trade or commerce, pursuant to La. Rev. Stat. Ann. § 51:1405(A).

214.    Specifically, Defendants have created a mental health crisis in the Public Schools, injuring the public health and safety of Plaintiff's community and interfering with the operations, use, and enjoyment of its Public Schools.

215.    Employees and patrons, including students have a right to be free from conduct that endangers their health and safety. Yet Defendants have engaged in conduct which endangers or injures the health and safety of the employees and students of the Public Schools by designing, marketing, and operating their respective social media platforms for use by students in a manner that substantially interferes with the functions and operations of the Public Schools and impacts the public health, safety, and welfare of the Parish.

216.    Each Defendant has created or assisted in the creation of a condition that is injurious to the health and safety of Plaintiff and its students and employees and interferes with the comfortable enjoyment of life and property of the Public Schools community.

217.    The health and safety of the students and employees of Public Schools, including those who use, have used, or will use Defendants' platforms, as well as those affected by others' use of their platforms, are matters of substantial public interest and of legitimate concern to Plaintiff.

218.    Defendants' conduct has affected and continues to affect a substantial number of people within the Public Schools community and is likely to continue causing significant harm.

219.    Defendants' conduct has directly caused a severe disruption of the public health, order, and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

220.  This harm to youth mental health and the corresponding impacts to public health, safety, and the welfare of the Public Schools community outweighs any social utility of Defendants' wrongful conduct.

221.  The rights, interests, and inconvenience to Schools' community far outweigh the rights, interests, and inconvenience to Defendants, who have profited tremendously from their wrongful conduct.

222.  But for Defendants' actions, Plaintiff's students would not use social media platforms as frequently or long as they do today, be deluged with exploitive and harmful content to the same degree, and the public health crisis that currently exists as a result of Defendants' conduct would have been averted.

223.  Logic, common sense, justice, policy, and precedent indicate Defendants' unfair and deceptive conduct has caused the damage and harm complained of herein. Defendants knew and intended that their design, promotion, and operation of their platforms would cause students to use their platforms excessively, that their marketing methods were designed to appeal to youth, and that their active efforts to increase youth use of their platforms were causing harm to youth and to schools, including youth under Plaintiff's care and custody.

224.  Thus, the fault of the Defendants and the harm and injury thereby caused was reasonably foreseeable, including the financial and economic losses incurred by Public Schools.

225.  Alternatively, Defendants' conduct was a substantial factor in bringing about the harm and injury described above even if a similar result would have occurred without it. By designing, marketing, promoting, and operating their platforms in a manner intended to maximize the time youth spend on their respective platforms—despite knowledge of the harms to youth from their wrongful conduct—Defendants directly facilitated the widespread, excessive, and habitual use of their platforms and the public nuisance affecting Public Schools. By seeking to capitalize on their success by refining their platforms to increase the time youth spend on platforms, Defendants directly contributed to the public health crisis affecting the Public Schools.

226.  Defendants' conduct is especially injurious to Public Schools because, as a direct and proximate cause of Defendants' conduct creating or assisting in the creation of a public nuisance, Plaintiff and its students and employees have sustained and will continue to sustain substantial injuries.  These injuries are, *inter alia*, an "ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by [Defendants] of an

61

unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405." *See* La. Rev. Stat. Ann. § 51:1409.

227.   Plaintiff has spent significant time and resources in attempting to take steps to mitigate the harm and disruption caused by Defendants' conduct, including the following:

    a.   hiring additional personnel to address mental, emotional, and social health issues;

    b.   developing additional resources to address mental, emotional, and social health issues;

    c.   increasing training for teachers and staff to identify students exhibiting symptoms affecting their mental, emotional, and social health;

    d.   training teachers, staff, and members of the community about the harms caused by Defendants' wrongful conduct;

    e.   developing lesson plans to teach students about the dangers of using Defendants' platforms;

    f.   educating students about the dangers of using Defendants' platforms;

    g.   addressing property damaged as a result of students acting out because of mental, social, and emotional problems Defendants' conduct is causing;

    h.   increasing disciplinary services and time spent addressing bullying, harassment, and threats;

    i.   confiscating devices on which students use Defendants' platforms while in class or on Plaintiff's school campuses;

    j.   meeting with students and the parents of students caught using Defendants' platforms at school or other disciplinary matters related to students' use of Defendants' platforms;

    k.   diverting time and resources from instruction activities to notify parents and guardians of students' behavioral issues and attendance;

    l.   investigating and responding to threats made against Plaintiff's schools and students over social media;

    m.   updating its student handbook to address use of Defendants' platforms; and

    n.   updating school policies to address use of Defendants' platforms.

228.   Fully abating the harms resulting from Defendants' conduct will require much more than these steps.

cause damage and [Defendants failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product."

238.    Defendants' platforms are "dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics."

239.    Further, "after the product...left [Defendants'] control," both the Instagram and TikTok Defendants acquired "knowledge of a characteristic of the product that may cause damage and the danger of such characteristic," or else would have acquired such knowledge had they "acted as a reasonably prudent manufacturer."

240.    **Defendants' breach of express warranty:** Defendants' platforms are unreasonably dangerous, as they do not "conform to an express warranty made at any time by the manufacturer about the product, in violation of La. Rev. Stat. Ann. § 9:2800.58. Defendants represent that their platforms are suitable to minors, and, more broadly, would lead a reasonable consumer to believe that they are free from the harmful consequences described, *supra*.

241.    For example, Instagram's Terms of Service[169] represent, *inter alia*, a commitment to "[f]ostering a positive, inclusive, and safe environment," stating "[w]e develop and use tools and offer resources to our community members that help to make their experiences positive and inclusive...We also have teams and systems that work to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior." Instagram further represents that it is intended for minors ages 13 and above.

242.    Similarly, TikTok's Community Guidelines[170], which are incorporated into its Terms of Service[171] warrant, *inter alia*, "a safe, trustworthy, and vibrant experience," and state that their guidelines are "informed by international legal frameworks, industry best practices, and input from our community, safety and public health experts, and our regional Advisory Councils. We evolve them to address emerging risks and potential harms that may occur from new behaviors." These Guidelines further warrant that content will be "age-restrict[ed]" for users under age 18. Specifically, TikTok's "Youth Safety and Well-Being"[172] statement warrants "a more limited experience designed with additional safety protections" for users under age 13, and additional protections for

---

[169] Available at https://help.instagram.com/581066165581870
[170] Available at https://www.tiktok.com/community-guidelines/en/
[171] Available at https://www.tiktok.com/legal/page/us/terms-of-service/en
[172] Available at https://www.tiktok.com/community-guidelines/en/youth-safety/?cgversion=2023

229.    Pursuant to La. R.S. § 51:1409(B) a copy of these pleadings have been served upon the Attorney General of the State of Louisiana. Accordingly, Plaintiff is entitled to all relief available pursuant to Louisiana's Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*, including but not limited to actual damages, trebled damages, attorney's fees, and costs.

## COUNT THREE
## (AS TO THE INSTAGRAM AND TIKTOK DEFENDANTS)
## VIOLATION OF LOUISIANA PRODUCTS LIABILITY ACT ("LPLA"),
## LA. REV. STAT. ANN. §§ 9:2800.51, *ET SEQ.*

230.    Plaintiff incorporates each preceding paragraph as though set forth fully herein. And in the alternative to its causes of action for fault and LUTPA, hereby alleges the following.

231.    Instagram and TikTok Defendants are "manufacturers" of their respective platforms, pursuant to La. Rev. Stat. Ann. § 9:2800.53(1).

232.    Defendants' respective platforms are "products," pursuant to La. Rev. Stat. Ann. § 9:2800.53(3).

233.    Plaintiff is a "claimant," pursuant to La. Rev. Stat. Ann. § 9:2800.53(4).

234.    Plaintiff has suffered "damage," pursuant to La. Rev. Stat. Ann. § 9:2800.53(5).

235.    **The platforms' construction/composition defect:** Instagram and TikTok Defendants' Platforms are unreasonably dangerous in construction or composition, in violation of La. Rev. Stat. Ann. § 9:2800.55, because, as described above, the platforms "deviated in a material way from the manufacturer's specifications or performance standards for the product."

236.    **The platforms' design defect:** Instagram and TikTok Defendants' Platforms are unreasonably dangerous in construction or composition, in violation of La. Rev. Stat. Ann. § 9:2800.55, because, at all relevant times, there "existed an alternative design for the product that was capable of preventing the claimant's damage," and "the likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." *See* La. Rev. Stat. Ann. § 9:2800.56. Specifically, the platforms contain the addictive design elements challenged above.

237.    **The platforms' inadequate warning:** Instagram and TikTok Defendants' Platforms are unreasonably dangerous, in violation of La. Rev. Stat. Ann. § 9:2800.57 because, "at the time the product left [Defendants'] control, the product possessed a characteristic that may

users from 13-18 (*id.*). Per TikTok, "[o]ur goal is to provide young people with an experience that is developmentally appropriate and helps to ensure a safe space for self-exploration." *Id.*

243.    Notwithstanding the above-described representations, both Instagram and TikTok have intentionally incorporated design elements into their platforms that are harmful to minors, and which directly contravene the above representations.

244.    In each and every instance identified in the foregoing paragraphs, Plaintiff's damage was proximately caused by Defendants' violations of La. Rev. Stat. Ann. § 9:2800.51, *et seq.*, said violations made Defendants' platforms unreasonably dangerous, and Plaintiff's damage arose from a reasonably anticipated use of the product by the claimant or someone else.

245.    As a result of these harms and of Defendants' conduct, Plaintiff seeks actual damages, attorney's fees, and all other available relief, including injunctive, declaratory, and other equitable remedies.

**COUNT FOUR**
**(AS TO THE ISP DEFENDANTS)**
**FAULT, LA. C.C. ART. 2315**

246.    Plaintiff incorporates each preceding paragraph as though set forth fully herein.

247.    Plaintiff brings this claim pursuant to the Tort Laws of the State of Louisiana which allow for relief for conduct complained of here.

248.    The intentional and negligent conduct of the ISP Defendants as hereinabove alleged is injurious to health or indecent or offensive to the senses, or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property.

249.    Intentional conduct that substantially and/or unreasonably interferes with the Plaintiff's use of its property is proscribed by Art. 2315.

250.    Defendants have materially contributed to a mental health crisis in Plaintiff's Public School System, (hereinafter "Public Schools") injuring the public health and safety of Plaintiff's community and interfering with the operations, use, and enjoyment of its Public Schools.

251.    Employees and patrons, including students have a right to be free from conduct that endangers their health and safety. Yet Defendants have engaged in conduct which endangers or injures the health and safety of the employees and students of the Public Schools by providing Internet access to the harmful social media platforms of the Instagram and TikTok Defendants, which are used by students in a manner that substantially interferes with the functions and operations of the Public Schools and impacts the public health, safety, and welfare of the Parish.

252. By allowing unfettered access to the social media platforms identified herein, during school hours, the ISP Defendants have created or assisted in the creation of a condition that is injurious to the health and safety of Plaintiff and its students and employees and interferes with the comfortable enjoyment of life and property of the Public Schools community.

253. The health and safety of the students and employees of Public Schools, including those who use, have used, or will use the Instagram and TikTok Defendants' platforms, as well as those affected by others' use of their platforms, are matters of substantial public interest and of legitimate concern to Plaintiff.

254. The ISP Defendants' conduct has affected and continues to affect a substantial number of people within the Public Schools community and is likely to continue causing significant harm.

255. The ISP Defendants' conduct has directly caused a severe disruption of the public health, order, and safety. The ISP Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

256. This harm to youth mental health and the corresponding impacts to public health, safety, and the welfare of the Public Schools community outweighs any social utility of the ISP Defendants' wrongful conduct.

257. The rights, interests, and inconvenience to Schools' community far outweigh the rights, interests, and inconvenience to the ISP Defendants, who have profited tremendously from their wrongful conduct.

258. But for the ISP Defendants' actions, Plaintiff's students would not use social media platforms as frequently or long as they do today, be deluged with exploitive and harmful content to the same degree, and the public health crisis that currently exists as a result, at least in part, of ISP Defendants' conduct would have been averted.

259. Logic, common sense, justice, policy, and precedent indicate ISP Defendants' unfair and deceptive conduct has caused the damage and harm complained of herein. ISP Defendants have actual and constructive knowledge that their services are being provided to students of the Public Schools, and that those services are being used to access harmful social media platforms, including those operated by the Instagram and TikTok Defendants.

260. Thus, the fault of the ISP Defendants and the harm and injury thereby caused was reasonably foreseeable, including the financial and economic losses incurred by Public Schools.

    j.  meeting with students and the parents of students caught using social media platforms that are accessible due to ISP Defendants' services at school or other disciplinary matters related to students' use of said social media platforms;

    k.  diverting time and resources from instruction activities to notify parents and guardians of students' behavioral issues and attendance;

    l.  investigating and responding to threats made against Plaintiff's schools and students over social media;

    m.  updating its student handbook to address use of social media platforms that are accessible due to ISP Defendants' services; and

    n.  updating school policies to address use of social media platforms that are accessible due to ISP Defendants' services.

264. Fully abating the nuisance resulting from ISP Defendants' conduct will require much more than these steps.

265. Plaintiff requests an order prospectively enjoining ISP Defendants from allowing Internet-enabled devices to connect to the Instagram and TikTok Defendants' platforms, on Public School property, during school hours.

**COUNT FIVE**
**(AS TO ALL DEFENDANTS)**
**EQUITABLE ESTOPPEL**

266. Plaintiff incorporates each preceding paragraph as though set forth fully herein.

267. Each Defendant has made representations, by conduct or work, of their ability to protect minors from harm. These include, *inter alia*, Instagram's and TikTok's representations set forth in paragraphs 174-177; and Charter's and Cox's representations set forth in paragraphs 180-184. More broadly, Defendants have at all times maintained that the challenged social media platforms are suitable for minors. *See, id.*

268. Plaintiff justifiably relied on these representations, and on the conduct of Defendants, holding out these platforms to the world as being suitable for minors.

269. Plaintiff changed its position in light of that reliance, to its detriment.

270. Estoppel is therefore warranted, and Plaintiff accordingly is entitled to all equitable relief flowing therefrom.

**PRAYER FOR RELIEF**

68

261.    Alternatively, ISP Defendants' conduct was a substantial factor in bringing about the harm and injury described above even if a similar result would have occurred without it. By allowing students access to social media platforms on school facilities and during school hours—Defendants directly facilitated the widespread, excessive, and habitual use of these platforms and the public nuisance affecting Public Schools. By such conduct, the ISP Defendants directly contributed to the public health crisis affecting the Public Schools.

262.    The ISP Defendants' conduct is especially injurious to Public Schools because, as a direct and proximate cause of ISP Defendants' conduct creating or assisting in the creation of a public nuisance, Plaintiff and its students and employees have sustained and will continue to sustain substantial injuries.

263.    Plaintiff has had to take steps to mitigate the harm and disruption caused by ISP Defendants' conduct, including the following:

    a.  hiring additional personnel to address mental, emotional, and social health issues;

    b.  developing additional resources to address mental, emotional, and social health issues;

    c.  increasing training for teachers and staff to identify students exhibiting symptoms affecting their mental, emotional, and social health;

    d.  training teachers, staff, and members of the community about the harms caused by ISP Defendants' wrongful conduct;

    e.  developing lesson plans to teach students about the dangers of using social media platforms that are accessible due to ISP Defendants' services;

    f.  educating students about the dangers of using social media platforms that are accessible due to ISP Defendants' services;

    g.  addressing property damaged as a result of students acting out because of mental, social, and emotional problems caused by social media platforms that are accessible due to ISP Defendants' services;

    h.  increasing disciplinary services and time spent addressing bullying, harassment, and threats;

    i.  confiscating devices on which students use social media platforms that are accessible due to ISP Defendants' services, while in class or on Plaintiff's school campuses;

WHEREFORE, Plaintiff prays for judgment as follows:

1. Enjoining Defendants from engaging in the conduct hereinabove described;

2. Awarding damages to fund prevention education and treatment for excessive and problematic use of social media;

3. Awarding actual and compensatory damages;

4. Awarding attorneys' fees and costs;

5. Awarding pre-judgment and post-judgment interest and costs; and

6. Such other and further relief as the Court deems just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

**FAYARD & HONEYCUTT, APC**

By: _____

Calvin C. Fayard, Jr. (La. Bar No. 05486)
D. Blayne Honeycutt (La. Bar No. 18264)
519 Florida Ave., SW
Denham Springs, LA 70726
Telephone: 225-664-4193
Email: calvin@fayardlaw.com
Email: dbhoneycutt@fayardlaw.com
*Counsel for Livingston Parish School Board*

**SERVICE INFORMATION ON FOLLOWING PAGE**

**PLEASE SERVE:**

**CHARTER COMMUNICATIONS, INC.**
    **Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

**CHARTER COMMUNICATIONS, LLC**
    **Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

**COX COMMUNICATIONS, INC**
    **Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

**COX COMMUNICATIONS LOUISIANA, LLC**
    **Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

**PLEASE SERVE VIA LOUISIANA LONG ARM:**

**META PLATFORMS, INC.**
    **Through its agent for service:**
CORPORATION SERVICE COMPANY
251 Little Falls Drive
Wilmington, DE 19808
(302)-636-5401

**INSTAGRAM, LLC**
    **Through its agent for service:**
CORPORATION SERVICE COMPANY
251 Little Falls Drive
Wilmington, DE 19808
(302)-636-5401

**BYTEDANCE INC.**
    **Through its agent for service:**
CORPORATION SERVICE COMPANY
251 Little Falls Drive
Wilmington, DE 19808
(302)-636-5401

**TIKTOK, INC.**
    **Through its agent for service:**
8605 Santa Monica Blvd. #201859
West Hollywood, CA 90069

**UNITED STATES CORPORATION AGENTS, INC.**
101 N. Brand Blvd., 11TH Floor
Glendale, CA 91203

70

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*



*Case: 000000178860*
*Division: C*
*21ˢᵗ Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**CHARTER COMMUNICATIONS, INC.**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

*To:*

*of EAST BATON ROUGE Parish*

**YOU ARE HEREBY SUMMONED** *to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21ˢᵗ Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.*

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21ˢᵗ Judicial District*
*Parish of Livingston*

**G.LAICHE**_____
**Deputy Clerk of Court**

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

_____

### *Service Information*

*Received on the* _____ *day of* _____, 20_____ *and on the* _____ *day of* _____, 20_____ *served the above named party as follows:*

**Personal Service** *on the party herein named* _____.
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of* _____, *a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:*_____

_____

*Returned:*
*Parish of* _____ *this* _____ *day of* _____, 20_____.

*Service*    $_____

*Mileage*    $_____

*Total*      $_____

*By:* _____
*Deputy Sheriff*

FOOTERAREA

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*



*Case: 000000178860*
*Division: C*
*21st Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**CHARTER COMMUNICATIONS, LLC**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

To:

*of EAST BATON ROUGE Parish*

**YOU ARE HEREBY SUMMONED** *to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21st Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.*

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21st Judicial District*
*Parish of Livingston*

**G.LAICHE**_____
**Deputy Clerk of Court**

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726
_____

### *Service Information*

*Received on the _____ day of _____, 20 ____ and on the _____ day of _____, 20____ served the above named party as follows:*

**Personal Service** *on the party herein named _____.*
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:_____*

_____

*Returned:*
*Parish of _____ this _____ day of _____, 20____.*

*Service*   $_____

*Mileage*   $_____

*Total*   $_____

*By: _____*
*Deputy Sheriff*

FOOTERAREA

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*



*Case: 000000178860*
*Division: C*
*21ˢᵗ Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**COX COMMUNICATIONS, INC**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

*To:*

*of EAST BATON ROUGE Parish*

**YOU ARE HEREBY SUMMONED** *to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21ˢᵗ Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.*

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21ˢᵗ Judicial District*
*Parish of Livingston*

*G.LAICHE* _____
*Deputy Clerk of Court*

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

### *Service Information*

*Received on the _____ day of _____, 20____ and on the _____ day of*

*_____, 20____ served the above named party as follows:*

**Personal Service** *on the party herein named* _____.
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:* _____

_____

*Returned:*
*Parish of _____ this _____ day of _____, 20____.*

*Service      $_____*

*Mileage      $_____*          *By:* _____
                                    *Deputy Sheriff*

*Total        $_____*

FOOTERAREA

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*



*Case: 000000178860*
*Division: C*
*21ST Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**COX COMMUNICATIONS LOUISIANA, LLC**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

To:   :

*of EAST BATON ROUGE Parish*

**YOU ARE HEREBY SUMMONED** *to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21st Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.*

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21st Judicial District*
*Parish of Livingston*

*G.LAICHE*_____
*Deputy Clerk of Court*

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

---

### *Service Information*

*Received on the _____ day of _____, 20_____ and on the _____ day of*

*_____, 20____ served the above named party as follows:*

**Personal Service** *on the party herein named _____.*
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:_____*

*_____*

*Returned:*
*Parish of _____ this _____ day of _____, 20____.*

*Service       $_____*

*Mileage       $_____*                    *By: _____*
                                               *Deputy Sheriff*

*Total         $_____*

FOOTERAREA

## *CITATION*
## PETITION FOR DAMAGES AND INJUNCTIVE RELIEF

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*



*Case: 000000178860*
*Division: C*
*21ˢᵗ Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**META PLATFORMS, INC.**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
251 Little Falls Drive
Wilmington, DE 19808
(302)-636-5401

*To:*

*of -- Parish*

**YOU ARE HEREBY SUMMONED** *to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21ˢᵗ Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.*

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21ˢᵗ Judicial District*
*Parish of Livingston*

*G.LAICHE_____*
*Deputy Clerk of Court*

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

### *Service Information*

*Received on the _____ day of _____, 20____ and on the _____ day of _____, 20____ served the above named party as follows:*

**Personal Service** *on the party herein named _____.*
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:_____*

*_____*

*Returned:*
*Parish of _____ this _____ day of _____, 20____.*

*Service      $_____*

*Mileage      $_____*        *By: _____*
                                  *Deputy Sheriff*

*Total        $_____*

FOOTERAREA

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*



*Case: 000000178860*
*Division: C*
*21ˢᵗ Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**INSTAGRAM, LLC**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
251 Little Falls Drive
Wilmington, DE 19808
*To:* (302)-636-5401

*of -- Parish*

**YOU ARE HEREBY SUMMONED** *to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21ˢᵗ Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.*

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21ˢᵗ Judicial District*
*Parish of Livingston*

*G.LAICHE*_____
**Deputy Clerk of Court**

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

<u>**Service Information**</u>

*Received on the* _____ *day of* _____ *, 20____ and on the* _____ *day of*

_____ *, 20____ served the above named party as follows:*

**Personal Service** *on the party herein named* _____.
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of* _____, *a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:*_____

_____

*Returned:*
*Parish of*_____ *this* _____ *day of* _____ *, 20____.*

*Service*        $_____

*Mileage*       $_____

*Total*           $_____

*By:* _____
*Deputy Sheriff*

FOOTERAREA

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*



*Case: 000000178860*
*Division: C*
*21ˢᵗ Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**BYTEDANCE INC.**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
251 Little Falls Drive
Wilmington, DE 19808
(302)-636-5401

*To:*

*of -- Parish*

**YOU ARE HEREBY SUMMONED** *to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21ˢᵗ Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.*

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21ˢᵗ Judicial District*
*Parish of Livingston*

*G.LAICHE*_____
*Deputy Clerk of Court*

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

### *Service Information*

*Received on the _____ day of _____, 20_____ and on the _____ day of*

*_____, 20_____ served the above named party as follows:*

**Personal Service** *on the party herein named _____.*
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:_____*

*_____*

*Returned:*
*Parish of _____ this _____ day of _____, 20_____.*

*Service*       $_____

*Mileage*       $_____                    *By:* _____
                                              *Deputy Sheriff*

*Total*         $_____

FOOTERAREA

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*



*Case: 000000178860*
*Division: C*
*21ˢᵗ Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

TIKTOK, INC.
**Through its agent for service:**
8605 Santa Monica Blvd. #201859
West Hollywood, CA 90069

*To:*

*of -- Parish*

**YOU ARE HEREBY SUMMONED** *to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21ˢᵗ Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.*

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21ˢᵗ Judicial District*
*Parish of Livingston*

*G.LAICHE*_____
**Deputy Clerk of Court**

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

<u>***Service Information***</u>

*Received on the* _____ *day of* _____ *, 20____ and on the* _____ *day of* _____ *, 20____ served the above named party as follows:*

**Personal Service** *on the party herein named* _____.
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of* _____, *a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:* _____

_____

*Returned:*
*Parish of* _____ *this* _____ *day of* _____ *, 20____.*

*Service*      $_____

*Mileage*     $_____

*Total*        $_____

*By:* _____
*Deputy Sheriff*

FOOTERAREA

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**



*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*

*Case: 000000178860*
*Division: C*
*21st Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**UNITED STATES CORPORATION AGENTS, INC.**
101 N. Brand Blvd., 11TH Floor
*To:* Glendale, CA 91203

*of -- Parish*

**YOU ARE HEREBY SUMMONED** to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21st Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21st Judicial District*
*Parish of Livingston*

**G.LAICHE**_____
*Deputy Clerk of Court*

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

### *Service Information*

*Received on the _____ day of _____, 20____ and on the _____ day of _____, 20____ served the above named party as follows:*

**Personal Service** *on the party herein named* _____.
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of* _____, *a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:*_____

_____

*Returned:*
*Parish of* _____ *this* _____ *day of* _____, 20_____.

*Service*     $_____

*Mileage*     $_____              *By:* _____
                                        *Deputy Sheriff*

*Total*        $_____

FOOTERAREA



# FAYARD AND HONEYCUTT

### Attorneys at Law
### A Professional Corporation

**CIVIL**

Calvin C. Fayard, Jr.
D. Blayne Honeycutt
Hannah Honeycutt Calandro

519 Florida Avenue, SW
Denham Springs, Louisiana 70726
Telephone: (225) 664-0304
Fax: (225) 664-2010

dbhoneycutt@fayardlaw.com
hannah@fayardlaw.com

+ A PROFESSIONAL CORPORATION

Of Counsel

Haydn S. Berey
Wanda J. Edwards

August 7, 2023

Clerk of Court
21st Judicial District Court
PO Box 1150
Livingston, LA 70754

RE:    **Livingston Parish School Board vs Meta Platforms, Inc., et al**
       **Docket No:  178,860  Div: C**

Dear Sir/Madam:

Enclosed please find an Affidavit of Service for the following defendants:

1.    Meta Platforms, Inc.
2.    Instagram, LLC
3.    Bytendance, Inc.
4.    Ticktok, Inc.

Please file these Affidavits of Service into the suit record and provide me with a file stamped copy in the enclosed envelope.

It is my understanding that the Livingston Parish School Board is not required to pay advanced costs to file these pleadings.

If you have any questions, please feel free to give me a call.

Sincerely,

**FAYARD & HONEYCUTT**

By: _____
    D. Blayne Honeycutt

DBH/bz
Enclosure

| LIVINGSTON PARISH SCHOOL BOARD | 21ST JUDICIAL DISTRICT COURT |
|---|---|
| VERSUS | |
| | DOCKET NO: 178,860  DIVISION: C |
| META PLATFORMS, INC., INSTAGRAM, LLC, BYTEDANCE, INC., TIKTOK, INC., CHARTER COMMUNICATIONS, INC., | |
| CHARTER COMMUNICATIONS, LLC., | PARISH OF LIVINGSTON |
| COX COMMUNICATIONS, INC., AND | |
| COX COMMUNICATIONS LOUISIANA, LLC | STATE OF LOUISIANA |

---

### AFFIDAVIT OF SERVICE

---

**PARISH OF LIVINGSTON**

**STATE OF LOUISIANA**

BEFORE ME, the duly appointed Notary Public, in and for the aforesaid Parish and State, personally came and appeared

**BENITA F. ZOMBO**

who, after being sworn, did depose and state:

That META PLATFORMS, INC has been made a party defendant to the case entitled, *Livingston Parish School board vs. Meta Platforms, Inc., et al*, Docket No. 178,860; Division C; 21st Judicial District Court, Parish of Livingston, State of Louisiana;

That I mailed to META PLATFORMS, INC, by certified U.S. Mail, receipt number 7022 2410 0000 5450 7843, a Citation for Service of Process, a certified copy of the Petition for Damages filed in the 21st Judicial District Court, Parish of Livingston, State of Louisiana;

I personally mailed the above pleadings to META PLATFORMS, INC, c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. Said certified mail was accepted on July 24, 2023 (See Exhibit "A" attached hereto and made a part hereof) therefore the defendant, META PLATFORMS, INC, was served pursuant to the Louisiana Long Arm Statute, LSA R.S. 13:3201.

_____
BENITA F. ZOMBO

SWORN TO AND SUBSCRIBED before me this 7th day of August, 2023 in Denham Springs, Louisiana.

D. BLAINE HONEYCUTT
BAR ROLL # 18264
STATE OF LOUISIANA
PARISH OF LIVINGSTON
My Commission is for Life

# FAYARD AND HONEYCUTT
### Attorneys at Law
### A Professional Corporation

Calvin C. Fayard, Jr., +
D. Blayne Honeycutt
Hannah Honeycutt Calandro

‹ A PROFESSIONAL CORPORATION

519 Florida Avenue, SW
Denham Springs, Louisiana 70726
Telephone: (225) 664-0304
Fax: (225) 664-2010

calvin@fayardlaw.com
dbhoneycutt@fayardlaw.com
hannah@fayardlaw.com

Of Counsel

Haydu S. Berey
Wanda J. Edwards

July 19, 2023

**Via Certified US Mail**
Meta Platforms, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

 Re:   Livingston Parish School Board vs. Meta Platforms, Inc., et al
      Docket No: 178,860   Div: C

Dear Sir/Madam:

Enclosed please find a Citation for service of process and a certified copy of the Petition for Damages and Injunctive Relief filed in the 21st Judicial District Court for the Parish of Livingston, State of Louisiana.

Service is hereby made upon you through the Louisiana Long-Arm Statute under the provision of La. R.S. 13:3201, et seq.  Please be advised that you have thirty (30) days within which to file an answer and/or responsive pleadings to the lawsuit for which you have been made a party defendant.  Should you fail to enter a response within the specified time period, a default judgment may be entered against you without further notice.

Sincerely,

**Fayard & Honeycutt**

By: _____
 D. Blayne Honeycutt





LIVINGSTON PARISH SCHOOL BOARD    21ST JUDICIAL DISTRICT COURT

VERSUS

                           DOCKET NO: 178,860  DIVISION: C

META PLATFORMS, INC., INSTAGRAM,
LLC, BYTEDANCE, INC., TIKTOK, INC.,
CHARTER COMMUNICATIONS, INC.,    PARISH OF LIVINGSTON
CHARTER COMMUNICATIONS, LLC.,
COX COMMUNICATIONS, INC., AND
COX COMMUNICATIONS LOUISIANA,    STATE OF LOUISIANA
LLC

---

### AFFIDAVIT OF SERVICE

---

PARISH OF LIVINGSTON

STATE OF LOUISIANA

    BEFORE ME, the duly appointed Notary Public, in and for the aforesaid Parish and

State, personally came and appeared

### BENITA F. ZOMBO

who, after being sworn, did depose and state:

    That INSTAGRAM, LLC has been made a party defendant to the case entitled,

*Livingston Parish School board vs. Meta Platforms, Inc., et al*, Docket No. 178,860; Division

C; 21st Judicial District Court, Parish of Livingston, State of Louisiana;

    That I mailed to INSTAGRAM, LLC, by certified U.S. Mail, receipt number 7022

2410 0000 5450 7829, a Citation for Service of Process, a certified copy of the Petition for

Damages filed in the 21st Judicial District Court, Parish of Livingston, State of Louisiana;

    I personally mailed the above pleadings to INSTAGRAM, LLC, c/o Corporation

Service Company, 251 Little Falls Drive, Wilmington, DE  19808.  Said certified mail was

accepted on July 24, 2023 (See Exhibit "A" attached hereto and made a part hereof) therefore

the defendant, INSTAGRAM, LLC, was served pursuant to the Louisiana Long Arm Statute,

LSA R.S. 13:3201.

                              _____
                              BENITA F. ZOMBO

    SWORN TO AND SUBSCRIBED before me this 7th day of August, 2023

in Denham Springs, Louisiana.

BLAYNE HONEYCUTT
BAR ROLL # 18264
STATE OF LOUISIANA
PARISH OF LIVINGSTON
... for Life

# FAYARD AND HONEYCUTT
## Attorneys at Law
### A Professional Corporation

Calvin C. Fayard, Jr., +
D. Blayne Honeycutt
Hannah Honeycutt Calandro

+ A PROFESSIONAL CORPORATION

519 Florida Avenue, SW
Denham Springs, Louisiana 70726
Telephone: (225) 664-0304
Fax: (225) 664-2010

calvin@fayardlaw.com
dbhoneycutt@fayardlaw.com
hannah@fayardlaw.com

Of Counsel

Haydn S. Berey
Wanda J. Edwards

July 19, 2023

**Via Certified US Mail**
Instagram, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

Re:    **Livingston Parish School Board vs. Meta Platforms, Inc., et al**
**Docket No: 178,860  Div: C**

Dear Sir/Madam:

Enclosed please find a Citation for service of process and a certified copy of the Petition for Damages and Injunctive Relief filed in the 21st Judicial District Court for the Parish of Livingston, State of Louisiana.

Service is hereby made upon you through the Louisiana Long-Arm Statute under the provision of La. R.S. 13:3201, et seq. Please be advised that you have thirty (30) days within which to file an answer and/or responsive pleadings to the lawsuit for which you have been made a party defendant. Should you fail to enter a response within the specified time period, a default judgment may be entered against you without further notice.

Sincerely,

**Fayard & Honeycutt**

By: _____
D. Blayne Honeycutt





LIVINGSTON PARISH SCHOOL BOARD

VERSUS

META PLATFORMS, INC., INSTAGRAM,
LLC, BYTEDANCE, INC., TIKTOK, INC.,
CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS, LLC.,
COX COMMUNICATIONS, INC., AND
COX COMMUNICATIONS LOUISIANA,
LLC

21ST JUDICIAL DISTRICT COURT

DOCKET NO: 178,860  DIVISION: C

PARISH OF LIVINGSTON

STATE OF LOUISIANA

---

**AFFIDAVIT OF SERVICE**

---

PARISH OF LIVINGSTON

STATE OF LOUISIANA

BEFORE ME, the duly appointed Notary Public, in and for the aforesaid Parish and State, personally came and appeared

**BENITA F. ZOMBO**

who, after being sworn, did depose and state:

That BYTEDANCE, INC. has been made a party defendant to the case entitled, *Livingston Parish School board vs. Bytedance, Inc., et al*, Docket No. 178,860; Division C; 21st Judicial District Court, Parish of Livingston, State of Louisiana;

That I mailed to BYTEDANCE, INC., by certified U.S. Mail, receipt number 7022 2410 0000 5450 7515, a Citation for Service of Process, a certified copy of the Petition for Damages filed in the 21st Judicial District Court, Parish of Livingston, State of Louisiana;

I personally mailed the above pleadings to BYTEDANCE, INC., c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. Said certified mail was accepted on July 24, 2023 (See Exhibit "A" attached hereto and made a part hereof) therefore the defendant, BYTEDANCE, INC, was served pursuant to the Louisiana Long Arm Statute, LSA R.S. 13:3201.

BENITA F. ZOMBO

SWORN TO AND SUBSCRIBED before me this 7th day of August, 2023 in Denham Springs, Louisiana.

BLAYNE HONEYCUTT
BAR ROLL # 18264
STATE OF LOUISIANA
PARISH OF LIVINGSTON
My Commission is for Life

# FAYARD AND HONEYCUTT
## Attorneys at Law
### A Professional Corporation

Calvin C. Fayard, Jr., +
D. Blayne Honeycutt
Hannah Honeycutt Calandro

+ A PROFESSIONAL CORPORATION

519 Florida Avenue, SW
Denham Springs, Louisiana 70726
Telephone: (225) 664-0304
Fax: (225) 664-2010

calvin@fayardlaw.com
dbhoneycutt@fayardlaw.com
hannah@fayardlaw.com

Of Counsel

Haydn S. Berey
Wanda J. Edwards

July 19, 2023

**Via Certified US Mail**
Bytedance, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

Re:   Livingston Parish School Board vs. Meta Platforms, Inc., et al
        Docket No: 178,860   Div: C

Dear Sir/Madam:

Enclosed please find a Citation for service of process and a certified copy of the Petition for Damages and Injunctive Relief filed in the 21st Judicial District Court for the Parish of Livingston, State of Louisiana.

Service is hereby made upon you through the Louisiana Long-Arm Statute under the provision of La. R.S. 13:3201, et seq.  Please be advised that you have thirty (30) days within which to file an answer and/or responsive pleadings to the lawsuit for which you have been made a party defendant.  Should you fail to enter a response within the specified time period, a default judgment may be entered against you without further notice.

Sincerely,

**Fayard & Honeycutt**

By:
        D. Blayne Honeycutt



| | |
|---|---|
| LIVINGSTON PARISH SCHOOL BOARD | 21ST JUDICIAL DISTRICT COURT |
| VERSUS | |
| META PLATFORMS, INC., INSTAGRAM, LLC, BYTEDANCE, INC., TIKTOK, INC., CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS, LLC., COX COMMUNICATIONS, INC., AND COX COMMUNICATIONS LOUISIANA, LLC | DOCKET NO: 178,860  DIVISION: C |
| | PARISH OF LIVINGSTON |
| | STATE OF LOUISIANA |

---

### AFFIDAVIT OF SERVICE

---

**PARISH OF LIVINGSTON**

**STATE OF LOUISIANA**

·BEFORE ME, the duly appointed Notary Public, in and for the aforesaid Parish and State, personally came and appeared

### BENITA F. ZOMBO

who, after being sworn, did depose and state:

That TICKTOK, INC. has been made a party defendant to the case entitled, *Livingston Parish School board vs. Meta Platforms, Inc., et al*, Docket No. 178,860; Division C; 21st Judicial District Court, Parish of Livingston, State of Louisiana;

That I mailed to TICKTOK, INC., by certified U.S. Mail, receipt number 7022 2410 0000 5450 7522, a Citation for Service of Process, a certified copy of the Petition for Damages filed in the 21st Judicial District Court, Parish of Livingston, State of Louisiana;

I personally mailed the above pleadings to TICKTOK, INC., 8605 Santa Monica Blvd #201859, West Hollywood, CA 90069.  Said certified mail was accepted on July 24, 2023 (See Exhibit "A" attached hereto and made a part hereof) therefore the defendant, TICKTOK, INC., was served pursuant to the Louisiana Long Arm Statute, LSA R.S. 13:3201.

BENITA F. ZOMBO

SWORN TO AND SUBSCRIBED before me this ___ day of _____, 2023 in Denham Springs, Louisiana.

Notary Public

**D. BLAYNE HONEYCUTT**
BAR ROLL # 18264
STATE OF LOUISIANA
PARISH OF LIVINGSTON
My Commission is for Life

# FAYARD AND HONEYCUTT

### Attorneys at Law
### A Professional Corporation

519 Florida Avenue, SW
Denham Springs, Louisiana 70726
Telephone: (225) 664-0304
Fax: (225) 664-2010

Calvin C. Fayard, Jr., +
D. Blayne Honeycutt
Hannah Honeycutt Calandro

calvin@fayardlaw.com
dbhoneycutt@fayardlaw.com
hannah@fayardlaw.com

+ A PROFESSIONAL CORPORATION

Of Counsel

Haydn S. Berey
Wanda J. Edwards

July 19, 2023

**Via Certified US Mail**
Tiktok, Inc.
8605 Santa Monica Blvd #201859
West Hollywood, CA 90069

Re:     Livingston Parish School Board vs. Meta Platforms, Inc., et al
         Docket No: 178,860   Div: C

Dear Sir/Madam:

Enclosed please find a Citation for service of process and a certified copy of the Petition for Damages and Injunctive Relief filed in the 21ˢᵗ Judicial District Court for the Parish of Livingston, State of Louisiana.

Service is hereby made upon you through the Louisiana Long-Arm Statute under the provision of La. R.S. 13:3201, et seq.  Please be advised that you have thirty (30) days within which to file an answer and/or responsive pleadings to the lawsuit for which you have been made a party defendant. Should you fail to enter a response within the specified time period, a default judgment may be entered against you without further notice.

Sincerely,

**Fayard & Honeycutt**

By:
         D. Blayne Honeycutt

DBH/bz
Enclosure





# USPS Tracking®

FAQs >

Tracking Number:                                                          Remove ✕

## 70222410000054507522

Copy    Add to Informed Delivery (https://informeddelivery.usps.com/)

### Latest Update

Your item was delivered to an individual at the address at 3:11 pm on July 24, 2023 in WEST HOLLYWOOD, CA 90069.

---

Get More Out of USPS Tracking:

USPS Tracking Plus®

Delivered

Delivered, Left with Individual

WEST HOLLYWOOD, CA 90069

July 24, 2023, 3:11 pm

See All Tracking History

Text & Email Updates                                                      ⌄

USPS Tracking Plus®                                                        ⌄

Product Information                                                        ⌄

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

## Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**



| | | |
|---|---|---|
| *LIVINGSTON PARISH SCHOOL BOARD* | | *Case: 000000178860* |
| | | *Division: C* |
| *Vs.* | *PAUPER SUIT* | *21st Judicial District Court* |
| | | *Parish of Livingston* |
| *META PLATFORMS INC - ET AL* | | *State of Louisiana* |

**CHARTER COMMUNICATIONS, INC.**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

To:

*of EAST BATON ROUGE Parish*

**YOU ARE HEREBY SUMMONED** *to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21st Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.*

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21st Judicial District*
*Parish of Livingston*

**G.LAICHE**
*Deputy Clerk of Court*

Attorney
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

___

***Service Information***

*Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:*

**Personal Service** *on the party herein named* _____
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:* _____

_____

Returned:
Parish of _____ this _____ day of _____ 20____

Service        $_____    Unable service on the named party through the
                              By: _____
Mileage       $_____    Corporate Services    *Deputy Sheriff*

Total         $_____    JUL 26 2023
                             by tendering a copy of this document to
                             DY. J.ALF [ ORIGINAL ]

Deputy Sheriff, Parish of East Baton Rouge, Louisiana

FILED
CLERK OF COURT
PARISH OF LIVINGSTON
2023 AUG 10 AM 8:18
DEPUTY CLERK

## Sid J. Gautreaux
### Sheriff East Baton Rouge Parish

Clerk of Court  Livingston Parish
P.O. Box 1150

Livingston, LA 70754

## DISTRICT COURT
For the Parish of East Baton Rouge
7/24/2023

Case: (33) 178860        LIVINGSTON PARISH SCHOOL BOARD vs META PLATFORMS INC-ET AL
1,842,909

| Nbr | Date | Service Type | Charges |
|---|---|---|---|
| 1 | 07/24/2023 | Citation<br>; 1 CORP SERVICES; BR, LA 70802 | $30.00 |
| 1 | 07/24/2023 | Mileage Charge | $3.12 |

|  |  |
|---|---|
| Case Total: | $33.12 |
| Total: | $33.12 |

Please make check payable to:
Sid J. Gautreaux, Sheriff
P.O. Box 3277
Baton Rouge, LA 70821

PLEASE RETURN THIS BILL WITH CHECK

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*



*PAUPER SUIT*

*Case: 000000178860*
*Division: C*
*21ˢᵗ Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**CHARTER COMMUNICATIONS, LLC**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

To:

*of EAST BATON ROUGE Parish*

**YOU ARE HEREBY SUMMONED** to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21ˢᵗ Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

Clerk of Court
21ˢᵗ Judicial District
Parish of Livingston

**G.LAICHE**
*Deputy Clerk of Court*

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

---

**Service Information**

Received on the _____ day of _____, 20____ and on the _____ day of

_____, 20____ served the above named party as follows:

**Personal Service** on the party herein named _____

**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

**DUE & DILIGENT UNABLE TO SERVE BECAUSE:** _____

_____

Returned:
Parish of _____ this _____ day of _____ 20____

Service $ _____                                    By: _____
~~made service on the named party through the~~
Mileage $ _____     Corporate Services          *Deputy Sheriff*

Total $ _____

JUL 26 2023
by tendering a copy of this document to
[ ORIGINAL ]

2023 AUG 10  AM 8:18
FILED CLERK OF COURT
PARISH OF LIVINGSTON
DEPUTY CLERK

**Sid J. Gautreaux**
**Sheriff East Baton Rouge Parish**

Clerk of Court Livingston Parish
P.O. Box 1150

Livingston, LA 70754

**DISTRICT COURT**

For the Parish of East Baton Rouge

7/24/2023

Case: (32) 178860    LIVINGSTON PARISH SCHOOL BOARD vs META PLATFORMS INC-ET AL
1,842,900

| Nbr | Date | Service Type | Charges |
|---|---|---|---|
| 2 | 07/24/2023 | Citation | $30.00 |
|  |  | ; 1 CORP SERVICES; BR, LA 70802 |  |
| 2 | 07/24/2023 | Mileage Charge | $3.12 |

|  |  |
|---|---|
| Case Total: | $33.12 |
| **Total:** | **$33.12** |

Please make check payable to:
Sid J. Gautreaux, Sheriff
P.O. Box 3277
Baton Rouge, LA 70821

PLEASE RETURN THIS BILL WITH CHECK

*CITATION*
## PETITION FOR DAMAGES AND INJUNCTIVE RELIEF

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC - ET AL*



*PAUPER SUIT*

*Case: 000000178860*
*Division: C*
*21st Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**COX COMMUNICATIONS, INC**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

To:

*of EAST BATON ROUGE Parish*

**YOU ARE HEREBY SUMMONED** *to comply with the demand contained in the petition of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 21st Judicial District Court in and for the Parish of Livingston, State of Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.*

**WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19, 2023.**

*Clerk of Court*
*21st Judicial District*
*Parish of Livingston*

**G.LAICHE**
*Deputy Clerk of Court*

Attorney
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

---

### Service Information

Received on the _____ day of _____, 20_____ and on the _____ day of

_____, 20____ served the above named party as follows:

**Personal Service** on the party herein named _____

**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

*DUE & DILIGENT UNABLE TO SERVE BECAUSE:* _____

_____

Returned:
Parish of _____ this _____ day of _____ 20____

Service _____ I made service on the named party through the

Mileage    $_____ Corporate Services

Total    $_____ JUL 26 2023

by tendering a copy of this document to
CELL # 907-0874

By: _____
*Deputy Sheriff*

[ORIGINAL]

*Deputy Sheriff, Parish of East Baton Rouge, Louisiana*

FILED
CLERK OF COURT
PARISH OF LIVINGSTON
2023 AUG 10 AM 8:17
DEPUTY CLERK



**Sid J. Gautreaux**
**Sheriff East Baton Rouge Parish**

Clerk of Court  Livingston Parish
P.O. Box 1150

Livingston, LA  70754

**DISTRICT COURT**

For the Parish of East Baton Rouge

7/24/2023

Case: (32) 178860        LIVINGSTON PARISH SCHOOL BOARD vs META PLATFORMS INC-ET AL
1,842,909

| Nbr | Date | Service Type | Charges |
|-----|------|-------------|---------|
| 3 | 07/24/2023 | Citation<br>; 1 CORP SERVICES; BR, LA 70802 | $30.00 |
| 3 | 07/24/2023 | Mileage Charge | $3.12 |

|  |  | Case Total: | **$33.12** |
|--|--|-------------|-----------|
|  |  | **Total:** | **$33.12** |

Please make check payable to:
Sid J. Gautreaux, Sheriff
P.O. Box 3277
Baton Rouge, LA 70821

PLEASE RETURN THIS BILL WITH CHECK

*CITATION*
**PETITION FOR DAMAGES AND INJUNCTIVE RELIEF**

*LIVINGSTON PARISH SCHOOL BOARD*

*Vs.*

*META PLATFORMS INC. ET AL*

 

*Case: 000000178860*
*Division: C*
*21st Judicial District Court*
*Parish of Livingston*
*State of Louisiana*

**COX COMMUNICATIONS LOUISIANA, LLC**
**Through its agent for service:**
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

To: _____ of *EAST BATON ROUGE Parish*

   **YOU ARE HEREBY SUMMONED** to comply with the demand contained in the petition of which a
true and correct copy, (exclusive of exhibits) accompanies this citation, or make an appearance, either by
filing a pleading or otherwise, the 21st Judicial District Court in and for the Parish of Livingston, State of
Louisiana, within TWENTY-ONE (21) days after the service hereof, under penalty of default.

   **WITNESS MY HAND AND SEAL OF OFFICE AT LIVINGSTON, LOUISIANA, ON JULY 19,**
**2023.**

                    Clerk of Court
                    21st Judicial District
                    Parish of Livingston

                    **G.LAICHE**
                    *Deputy Clerk of Court*

*Attorney*
D. BLAYNE HONEYCUTT
519 FLORIDA AVE, SW
DENHAM SPRINGS, LA 70726

                    ***Service Information***

Received on the _____ day of _____, 20____ and on the _____ day of
_____, 20____ served the above named party as follows:

**Personal Service** on the party herein named _____
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the
hands of _____, a person apparently over the age of seventeen
years, living and residing in said domicile and whose name and other facts connected with this service, I
learned by interrogating the said person, said party herein being absent from his/her residence at the time of
said service.

**DUE & DILIGENT UNABLE TO SERVE BECAUSE:** _____

_____

*Returned:*
Parish of _____  I made service on the named party through the _____ day of _____, 20__

Service    $_____

Mileage    $_____

Total      $_____

                    Corporate Services
                    By: _____
                    Deputy Sheriff
                    JUL 28 2023
                    by tendering a copy of this document to
                    LT. J. ALFRED
                    CELL # 907-0871

                    Deputy Sheriff, Parish of East Baton Rouge, Louisiana

                    [ORIGINAL]

**Sid J. Gautreaux**
**Sheriff East Baton Rouge Parish**

Clerk of Court  Livingston Parish
P.O. Box 1150

Livingston, LA 70754

**DISTRICT COURT**

For the Parish of East Baton Rouge

7/24/2023

| Case: (32) 178860 | LIVINGSTON PARISH SCHOOL BOARD vs META PLATFORMS INC-ET AL | |
|---|---|---|
| 1,842,909 | | |

| Nbr | Date | Service Type | Charges |
|---|---|---|---|
| 4 | 07/24/2023 | Citation | $30.00 |
| | | ; 1 CORP SERVICES; BR, LA 70802 | |
| 4 | 07/24/2023 | Mileage Charge | $3.12 |

| | | |
|---|---|---|
| | Case Total: | $33.12 |
| | Total: | $33.12 |

Please make check payable to:
Sid J. Gautreaux, Sheriff
P.O. Box 3277
Baton Rouge, LA 70821

PLEASE RETURN THIS BILL WITH CHECK

# FAYARD AND HONEYCUTT

### Attorneys at Law
### A Professional Corporation

Calvin C. Fayard, Jr.

D. Blayne Honeycutt

Hannah Honeycutt Calandro

* A PROFESSIONAL CORPORATION

519 Florida Avenue, SW
Denham Springs, Louisiana 70726
Telephone: (225) 664-0304
Fax: (225) 664-2010

dbhoneycutt@fayardlaw.com
hannah@fayardlaw.com

Of Counsel

Haydn S. Berey
Wanda J. Edwards

August 16, 2023

**CIVIL**

Clerk of Court
21st Judicial District Court
PO Box 1150
Livingston, LA 70754

**RE:    Livingston Parish School Board vs Meta Platforms, Inc., et al
Docket No: 178,860  Div: C**

Dear Sir/Madam:

Enclosed please find a Motion and Order to Enroll as Co-Counsel of Record to be filed into the above referenced suit record.  I ask that you please provide me with a file stamped copy in the enclosed envelope.

It is my understanding that the Livingston Parish School Board is not required to pay advanced costs to file these pleadings.

If you have any questions, please feel free to give me a call.

Sincerely,

**FAYARD & HONEYCUTT**

By: _____
D. Blayne Honeycutt

DBH/bz
Enclosure

cc:  Frank C. Dudenhefer, Jr.

LIVINGSTON PARISH SCHOOL BOARD

VERSUS

META PLATFORMS, INC., INSTAGRAM,
LLC, BYTEDANCE, INC., TIKTOK, INC.,
CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS, LLC.,
COX COMMUNICATIONS, INC., AND
COX COMMUNICATIONS LOUISIANA,
LLC

21ST JUDICIAL DISTRICT COURT

DOCKET NO.: 78,860 DIVISION: C

PARISH OF LIVINGSTON

STATE OF LOUISIANA

---

### MOTION TO ENROLL AS CO-COUNSEL OF RECORD

---

**NOW INTO COURT,** through undersigned counsel, comes the plaintiff, Livingston Parish School Board, who on suggesting to the Court that they wish to enroll Frank C. Dudenhefer, Jr., of The Dudenhefer Law Firm LLC, as co-counsel of record in the above captioned matter.

**WHEREFORE,** mover prays that Frank C. Dudenhefer, Jr., of the The Dudenhefer Law Firm LLC, be enrolled as additional counsel of record for the plaintiff, Livingston Parish School Board.

Respectfully submitted:

**FAYARD & HONEYCUTT**

By: _____
D. BLAYNE HONEYCUTT(18264)
519 Florida Avenue SW
Denham Springs, LA 70726
Phone: 225-664-0304
Fax: 225-664-0304
Email: dbhoneycutt@fayardlaw.com
Counsel for plaintiff

---

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing Motion and Order to Enroll Co-Counsel of Record was this day forwarded to all counsel of record via fax, electronic mail and/or by depositing same in the United States Mail, postage prepaid.

Signed in Denham Springs, Louisiana, this 16 day of Aug, 2023.

_____
D. Blayne Honeycutt

LIVINGSTON PARISH SCHOOL BOARD

VERSUS

META PLATFORMS, INC., INSTAGRAM,
LLC, BYTEDANCE, INC., TIKTOK, INC.,
CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS, LLC.,
COX COMMUNICATIONS, INC., AND
COX COMMUNICATIONS LOUISIANA,
LLC

21ST JUDICIAL DISTRICT COURT

DOCKET NO: 178,860  DIVISION: C

PARISH OF LIVINGSTON

STATE OF LOUISIANA

---

## ORDER

**CONSIDERING** the above Motion to Enroll as Co-Counsel of Record,

**IT IS ORDERED** that Frank C. Dudenhefer, Jr., of The Dudenhefer Law Firm LLC be

enrolled as additional counsel of record for the plaintiff, Livingston Parish School Board.

Signed in Livingston Louisiana on this 22nd day of August, 2023.

_____
HONORABLE ERIKA W. SLEDGE
Judge, 21st Judicial District Court
Division C